# IN THE UNITED STATES DISTRICT
# COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GHALEB NASSAR AL BIHANI,** | Civil Action No: 05-cv-01312 (RJL) |
| Guantánamo Bay Naval Station, | |
| Guantánamo Bay, Cuba | |
| | |
| and | |
| | |
| **ASIM BEN THABIT AL-KHALAQI,** | Civil Action No: 05-cv-999 (RBW) |
| Guantánamo Bay Naval Station, | |
| Guantánamo Bay, Cuba, | |
| | |
| Petitioners | |
| | |
| v. | |
| | |
| **GEORGE W. BUSH** | |
| President of the United States | |
| The White House | |
| 1600 Pennsylvania Avenue, N.W. | |
| Washington, D.C. 20500; | |
| | |
| **DONALD RUMSFELD** | |
| Secretary, United States | |
| Department of Defense | |
| 1000 Defense Pentagon | |
| Washington, D.C. 20301; | |
| | |
| **ARMY BRIG. GEN. JAY HOOD** | |
| Commander, Joint Task Force - GTMO | |
| APO AE 09360; and | |
| | |
| **ARMY COL. MIKE BUMGARNER** | |
| Commander, Joint Detention | |
| Operations Group - JTF-GTMO | |
| APO AE 09360, | |
| | |
| Respondents | |

### PETITIONERS' REPLY BRIEF IN SUPPORT OF MOTION FOR AN ORDER REQUIRING ADVANCE NOTICE OF ANY REPATRIATIONS OR TRANSFERS FROM GUANTÁNAMO BAY

Petitioners, by and through undersigned counsel, and file this reply in support of their motion seeking an order requiring Respondents to provide them, through counsel, with 30 days advance notice of Respondents' intended removal of Petitioners from the Guantánamo Bay Naval Base in Cuba ("Guantánamo Bay") to a jurisdiction outside the United States. Petitioners continue to press this motion because Respondents' counsel has indicated an unwillingness to give even two weeks notice before transferring Petitioners -- an otherwise simple solution to this problem. Without the relief requested, Petitioners will suffer irreparable harm because they are at risk of torture or continued prolonged detention without charges or review by a neutral legal authority and, by depriving this Court of jurisdiction over Petitioners' habeas and civil claims, they will never have the opportunity to vindicate their loss of liberty through the legal process which the Supreme Court has indicated they are entitled to pursue. See Rasul v. Bush, 542 U.S. 466 (2004). Respondents have failed to demonstrate any cognizable harm they would suffer from the modest relief Petitioners request, whereas the harm to Petitioners from being rendered into foreign custody is serious and irreparable. This Court should grant Petitioners' motion.

## I.

## OVERVIEW

The risks Petitioners face should this Court not grant this motion are severe. Torture, once inflicted, cannot be undone, and its effects may be permanent. In addition, petitioners have strong interests in having their claims vindicated in federal court. In stark contrast, Respondents' claims that they will suffer irreparable harm if this Court grants Petitioners' motion are belied by the limited nature of the relief Petitioners seek: Petitioners request only notice.

Significantly, many judges of this Court have granted similar motions, finding that petitioners have demonstrated irreparable injury and/or a substantial likelihood of success on the merits. See, e.g., Kurnaz v. Bush, 2005 WL 839542 (D.D.C. Apr. 12, 2005) ("petitioners must

be given notice of a potential transfer in a limited type of circumstance. In particular, if respondents have not reached a diplomatic understanding with the transferee country that a petitioner's transfer from Guantanamo is for release only, respondents must provide that petitioner's counsel with thirty days advance notice of the proposed transfer"); Al-Marri v. Bush, No. 04-2035 (D.D.C. Apr. 4, 2005); Al-Joudi v. Bush, No. 05-0301 (D.D.C. Apr. 4, 2005); Al-Shiry v. Bush, No. 04-0490 (D.D.C. Apr. 1, 2005); Al-Oshan v. Bush, No. 05-0520 (D.D.C. Mar. 31, 2005); Abdah, et al. v. Bush, et al., 2005 WL 711814 (D.D.C. March 29, 2005) (preliminary injunction requiring notice prior to transfer from Guantanamo warranted); Abdullah, et al. v. Bush, et al., No. 05-23 (D.D.C. March 16, 2005)(RWR) (petitioners can "seek emergency relief from this court in appropriate circumstances, such as when petitioners have reason to believe that they are facing the possibility of continued detention at the request of the United States in a location that does not provide access to this court," and affirmatively ordering that the government to disclose, by specified date "whether, at the time the statement is filed, Respondents have plans, or reasonably anticipate making plans . . . to move [each] petitioner, and if so, to where, when, and under what terms and conditions").[1]  Respondents' declarations do not assert that these previously issued orders by other judges have caused any sort of harm to befall them.

---

[1]  While Respondents accurately note that several other judges of this Court have concluded that no such preliminary injunction was warranted, at least one such decision appears to be based on a far more extensive record and government concessions that are not apparent here, see Al-Anazi v. Bush, 370 F. Supp. 2d 188, 196 (D.D.C. 2005) and the others did not decide all the legal arguments addressed in Petitioners' pleadings.  Finally, that a number of different judges from this same court have decided these important issues differently and the issues are currently the subject of interlocutory appeals as averred by Respondents, see Resp. Br. at 1-2 n.1, strongly favors preserving the status quo and entering a preliminary injunction. Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977); Teva Pharmaceuticals, USA, Inc. v. FDA, ___ F. Supp. 2d ___, 2005 WL 3475676, *1 (D.D.C. Dec. 8, 2005) (where there are "genuine issues . . . to grapple with on appeal[,] [t]hat alone may arguably satisfy the first prong of the test for injunctive relief.") (citing Holiday Tours, 559 F.2d at 843-44).

This Court's ability to enforce its orders, if lost, may be impossible to regain. Petitioners' requested relief does nothing more than provide notice to enable Petitioners to seek to preserve this Court's jurisdiction and ability to enforce its orders. Contrary to Respondents' assertions, this Court need not stand aside while Respondents transfer illegally-held prisoners into the custody of a torture-practicing foreign state, in violation of the United States' obligations under international and domestic law. Petitioners' interest in having this Court adjudicate their claims is equally strong and not outweighed by Respondents' interests.[2] This Court should grant Petitioners' motion, and require Respondents to give Petitioners at least 30 days notice of any planned transfer.

## II.

## ARGUMENT AND CITATION OF AUTHORITIES

### A.    Petitioner is Entitled to the Limited Injunctive Relief That He Seeks

This is an extraordinary situation warranting extraordinary relief. In an ordinary case, a petitioner is not held incommunicado by the Respondent, is not wholly at the Respondent's mercy, and is not at risk of being shipped off to a foreign country, outside of the Court's jurisdiction, that is known to practice torture. In an ordinary case, a petitioner has the opportunity to present his own testimony, and the respondent does not have the power to unilaterally deprive the petitioner of that right. In an ordinary case involving a request for habeas relief, there typically have been extensive prior legal proceedings subject to full judicial review. None of these "ordinary" facts exist here.

In analyzing whether a preliminary injunction is warranted, a four-factor balancing test is employed where the following are examined: 1) whether a movant can demonstrate a substantial likelihood of success on the merits, 2) whether he can demonstrate irreparable injury if the

---

[2] Indeed if Respondents have no plans to "render" or transfer petitioner outside of Guantanamo into detention in Yemen or to any other country, then requiring them to simply give notice of any intention to do so in the future would pose no detriment whatsoever.

injunction is not granted, 3) whether he can demonstrate that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.  However, the four-factor test is a balancing test and the D.C. Circuit holds that in performing the balancing test required for the preliminary injunction inquiry,

> the district court must balance the strengths of the requesting party's arguments in each of the four required areas.  If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.  An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C.Cir. 1995).  In addition, the D.C. Circuit also holds that "[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant."  Holiday Tours, Inc., 559 F.2d at 844.  Furthermore, such an order is appropriate when "[t]here is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success."  Id.

Because Petitioners present several serious legal questions and little if any harm will befall Respondents should the Court grant Petitioners' requested relief, and denial of the order likely would inflict irreparable injury on Petitioners, this Court should grant Petitioners' motion. Id.

**1.    Petitioners' Underlying Claims Present Serious Legal Questions**

Despite Respondents' assertions to the contrary, Petitioners have presented serious and substantial claims that this Court should hear without unilateral interference by Respondents.  In their Civil Complaints and First Amended Petitions for Writs of Habeas Corpus, Petitioners raise numerous independent claims for relief, including claims arising under the United States Constitution, United States law, and international law and treaties.  Respondents focus on Petitioners' challenge to his prolonged detention, completely ignoring the broader relief that

5

Petitioners seek.  However, all of Petitioners' challenges are properly before this Court and require this Court's attention.

The Supreme Court itself has noted the viability of Petitioners' habeas corpus claim: Petitioners' allegations -- that, although they have engaged neither in combat nor in acts of terrorism, they has been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing -- "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'" Rasul, 542 U.S at 483 n.15 (quoting 28 U.S.C. 2241(c)(3)).

In an order filed in the consolidated Guantánamo cases, Judge Green of this Court followed the Supreme Court's directive and found that identically-situated petitioners raised meritorious claims in habeas corpus petitions.  See In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).  In particular, Judge Green found that the Guantánamo Bay detainees in eleven consolidated cases stated viable claims under the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention. Id. at 481. Like these other detainees, Petitioners state viable claims.

Respondents argue that Petitioners have not established that they possess some independent, judicially enforceable right to challenge their repatriation or transfer, and thus that Respondents need not give Petitioners notice of such repatriation or transfer.  However, this argument misses the point.  As noted above, the Supreme Court in Rasul confirmed this Court's jurisdiction -- and the viability of their claims -- and Judge Green in the consolidated Guantánamo Cases ruled that valid claims exist.  The issue, then, is not simply whether Petitioners might—in the abstract—have standing to file a separate lawsuit alleging independent grounds to block the government's planned transfers.  Instead, the issue is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its properly exercised jurisdiction.  The answer to that question must be "yes."

6

At any rate, Petitioners do assert the right to challenge their repatriation or transfer. Obviously, Petitioners contest the legality of their detention. They ask that the Court issue writs of habeas corpus as a result. Traditionally, courts view possession of an item as encompassing not only the actual possession of it, but also the right to dispose of it as the possessor sees fit. Here, Respondents, having unlawfully acquired "possession" of petitioners, assert a right to "dispose" of them as they see fit, by transferring them to a third party without their consent, without consultation with them, and under such circumstances as respondents unilaterally arrange. Cf. United States v. Williams, 952 F.2d 418, 420 (D.C. Cir. 1991) (defendant's attempt to dispose of drugs was evidence of his possession). The claimed right to effect such a transfer is not so much the termination of the unlawful custody as another manifestation of it. By challenging their unlawful detention, Petitioners also challenge Respondents' right to "dispose" of them.

More fundamentally, Petitioners also dispute Respondent's authority to transfer them to another country for the purpose of criminal prosecution in that country. See Resp. Br. at 4. As the Supreme Court has made clear, "there is no authority vested in any department of the government to seize a fugitive criminal and surrender him to a foreign power." Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 8-9 (1936) (internal quotations, citation omitted). Valentine's analysis is based upon first principles:

> It rests upon the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law. There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law.

Id. at 9. Accord In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993) ("no branch of government has authority to surrender an accused to a foreign country except in pursuance of a statute or treaty"); Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir. 1986) (same). In short, Petitioners contend that Respondents lack "*any* authority to surrender [them] to a foreign

government except as provided by statute or treaty." Quinn, 783 F.2d at 782 (emphasis added). Respondents have invoked no such authority.

Finally, Petitioners' presence in Guantanamo confers on them constitutional and statutory rights, the assertion of which would be frustrated should they be transferred to another country without any opportunity to object.  As the Supreme Court put it in evaluating allegations similar to those made here, the Rasul petitioners' allegations "*unquestionably* describe 'custody in violation of the Constitution or laws or treaties of the United States.'"  Rasul, 542 U.S. at 483 n.15 (quoting 28 U.S.C. § 2241(c)(3)) (emphasis added).[3]   See also Gherebi v. Bush, 374 F.3d 727, 737 n.14 (9th Cir. 2004) (citing Haitian Ctrs. Council, Inc. v. McNary, 969 F.2d 1326, 1342 (2d Cir. 1992), vacated as moot sub. nom., Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 918 (1993)).[4]  Thus, Petitioners "unquestionably" have stated viable constitutional claims under Rasul.

_____Moreover, Gherebi adopted the Second Circuit's analysis in Haitian Ctrs. Council, a case that involved issues very similar to those presented here.  See id.  In Haitian Ctrs. Council, the

---

[3]  Relying upon the question presented in Rasul and its jurisdictional focus, Khalid v. Bush, 355 F. Supp.2d 311, 322-23 (D.D.C. 2005), rejected Rasul's conclusion that the Rasul petitioners "unquestionably describe[d] 'custody in violation of the Constitution or laws or treaties of the United States.'"  Rasul, 542 U.S. at 483 n.15.  Petitioner respectfully disagrees with Khalid's narrow reading of Rasul.  "'As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.'"  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 67 (1996) (citation omitted).  Rasul's statement that the Rasul petitioners "unquestionably" presented viable constitutional claims is part of the Supreme Court's "explication[] of the governing rules of law.'"  See id.  Indeed, the fact that Rasul's statement was so unequivocal demonstrates that it was not merely an off-hand remark.

Nor is it necessary to consider Johnson v. Eisentrager, 339 U.S. 763 (1950), to have been overruled for Petitioners to state a constitutional claim.  The underlying theme of Rasul is that Eisentrager is distinguishable.  See, e.g., Rasul, 542 U.S. at 476 ("Petitioners in these cases differ from the Eisentrager detainees in important respects").  Because the Eisentrager detainees are indisputably differently situated, Eisentrager cannot be read to contradict Rasul's statement that the Rasul petitioners "unquestionably" stated a constitutional claim.

[4]  Khalid does not cite Gherebi or Haitian Ctrs. Council.

Second Circuit affirmed a district court's grant of a preliminary injunction to Haitian asylum seekers who were interdicted in international waters and then taken to Guantanamo.  Specifically, it found that the aliens' "raise[d] serious questions going to the merits of [their] claim that the fifth amendment applies to non-accused, non-hostile aliens held incommunicado on a military base within the *exclusive* control of the United States, namely Guantanamo Bay."  Haitian Ctrs. Council, 969 F.2d at 1343 (emphasis in original).  Based on this analysis, the Ninth Circuit adopted Haitian Ctrs. Council's conclusion:

> "It does not appear to us to be incongruous or overreaching to conclude that the United States Constitution limits the conduct of United States personnel with respect to officially authorized interactions with aliens brought to and detained by such personnel on a land mass exclusively controlled by the United States ... given the undisputed applicability of federal criminal laws to incidents that occur there and the apparent familiarity of the government personnel at the base with the guarantes of due process, fundamental fairness and human treatment which this country purports to afford to all persons."

Gherebi, 374 F.3d at 737 n.14 (quoting Haitian Ctrs. Council, 969 F.2d at 1343).

Haitian Ctrs. Council also concluded that the district court correctly found that the aliens in that case faced irreparable harm: "[d]eportation to a country where one's life would be threatened obviously would result in irreparable injury."  969 F.2d at 1339 (citation, internal quotations omitted).  The irreparable harm resulting from rendition or transfer to a state in which torture is practiced is equally obvious.  Thus, Petitioners have raised substantial challenges to Respondents' assertion of a unilateral right to transfer them to a country of its choosing.

**2.    The Requested Injunction Will Cause Respondents No Cognizable Harm**

Respondents fail to demonstrate that they would be harmed if this Court enjoins Respondents from transferring Petitioners into the custody of a foreign government without notice or an opportunity for Petitioners to be heard.

Petitioners request exceedingly modest relief.  They request *notice*.  It is by no means clear that this motion will ever prevent any transfers that Respondents wish to effect; nor is it clear that Petitioners will ever attempt to prevent any transfers.  All Petitioners seek here is 30

days' advance notice of the government's intent to transfer them.  If this Court grants Petitioners' motion, and the government provides such notice, Petitioners conceivably may decide not to challenge the government's proposed transfer.  Alternatively, if this Court grants the motion, the government may decide not to render Petitioners into another country's detention.  Thus, the Respondents' dire predictions of judicial interference in foreign policy decisions of the Executive Branch, and separation of powers concerns, ring hollow.  At this stage, where Petitioners ask for nothing more than notice and an opportunity to be heard -- the most fundamental attributes of due process -- Respondents' predictions are premature, if not completely irrelevant.

The fundamental nature of notice and an opportunity to be heard before any deprivation of liberty occurs is a bedrock constitutional principle.  Fuentes v. Shevin, 407 U.S. 67, 82 (1983).  This "bedrock principle" was recently reaffirmed in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), where the Court held that Mr. Hamdi must receive notice and a fair opportunity to be heard before a neutral decision-maker.   Id. at 533 (citations omitted).  The Supreme Court further quoted Fuentes, noting that "[f]or more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard;  and in order that they may enjoy that right they must first be notified.'   It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' "  Id. at 533 (quoting Fuentes, 407 U.S. at 80).  Petitioners seek only that "bedrock" protection assured under the Fifth Amendment.

Contrary to Respondents' assertions, the requested injunction does not prevent or prohibit Respondents from obtaining "assurances" from a foreign government, although such "assurances" appear to be of limited value in any event.  See Amnesty International, Torture and secret detention: Testimony of the 'disappeared' in the 'war on terror'  AMR 51/108/2005 (Aug. 4, 2005), available at  http://web.amnesty.org/library/pdf/AMR511082005ENGLISH/ $File/AMR5110805.pdf (last visited on Dec. 27, 2005); "Empty Promises": Diplomatic Assurances No Safeguard Against Torture, Human Rights Watch, Vol. 16, No. 4 (Apr. 2004).

Certainly, this Court may lift or modify an injunction if the Respondents can demonstrate a justification for doing so, and the only effect that an injunction would have in this case would be to permit Petitioners to challenge a transfer, and prevent the possible loss of this Court's jurisdiction, before that transfer takes place. Nor is there any legitimate fear of "disclosure" of confidential communications with a foreign government arising from there mere giving of notice of a proposed course of action. Cf. Padilla v. C.T. Hanft, U.S.N., __ F.3d __, 2005 WL 3489526, *3 (4th Cir. Dec. 21, 2005) (rejecting potential future disclosure of information as a basis for the government's conduct in the Padilla litigation).

Respondents' also allege that a "chilling effect" would come from "public" disclosures. See Resp. Br. at 7. However, as Respondents well know, in this case, secure facilities have already been established for the handling, review and maintenance of sensitive classified information. In the course of their representation of the Guantánamo Bay detainees, counsel for Guantánamo Bay detainees (including Petitioners' counsel) will have access to extensive information that they cannot—and will not—share, either with the public or with their clients. Respondents have failed to identify how "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.

In the end, the "parade of horribles" that Respondents conjure in their attempts to obfuscate the reasonableness and simplicity of the relief Petitioners seek here is utterly ephemeral. If this Court orders Respondents to provide Petitioners' counsel with notice of an intended transfer, Respondents will not be harmed and the status quo will be preserved. See Padilla, 2005 WL 3489526 at *5 ("On an issue of such surpassing importance, we believe the rule of law is best served by maintaining on appeal the status quo in all respects and allowing Supreme Court consideration of the case in the ordinary course, rather than by an eleventh-hour transfer and vacatur... .").

**3.      Petitioner Will Suffer Irreparable Harm if He is Rendered to a Foreign Nation Without Notice or An Opportunity to Be Heard**

In stark contrast, there is ample evidence that the Petitioners are subject to a very real and imminent risk of being rendered into the custody of a foreign government.  Furthermore, there is ample evidence that Yemen, the most likely country to which Petitioners would be sent, engages in torture.

There is no question that Guantánamo Bay detainees, such as Petitioners, are routinely transferred at Respondents' whim.  In their opposition brief, Respondents concede that "[a]lmost 250 Guantanamo detainees have been so transferred, over a period spanning several years."  See Resp. Br. at 3, Resp. Br. Ex. A (Waxman Decl.¶ 4).  News reports have confirmed that the United States government has a "plan to cut by more than half the population at its detention facility in Guantánamo Bay, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials."  See Douglas Jehl, Pentagon Seeks to Transfer More Detainees from Base in Cuba, N.Y. Times, Mar. 11, 2005.  See also Douglas Jehl & David Johnston, Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails, N.Y. Times, Mar. 6, 2005.  Thus, there is a very real possibility that an un-noticed transfer of either or both Petitioners is imminent.

In his declaration, Mr. Waxman unequivocally acknowledges that transferee foreign governments include "the government of a detainee's home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee."  Resp. Br. Ex. A (Waxman Decl. at ¶ 3).  In this case, the home country for the Petitioners  is Yemen, a country well-known for its frequent use of torture.  There are two distinct and equally important harms that Petitioners would suffer if Respondents render them to Yemen with no opportunity to challenge a transfer.  First, after transferring Petitioners to Yemen, the Respondents would surely turn around and argue that this Court no longer has jurisdiction over the case.  Indeed, Respondents concede this.  See Resp. Br. at 10 ("[R]elease from United States

custody will give petitioners all the relief they can seek . . . .").  However, the Supreme Court has made it plain that this Court presently has jurisdiction over Petitioners' claims, and that such claims are actionable under United States law. See Rasul, 542 U.S. at 483 n.15.  The requested injunction does nothing more than preserve this Court's well-established jurisdiction over this dispute, and prevent the Respondents from exercising self-help to avoid that jurisdiction by "disposing" of an inconvenient litigant  See Padilla, 2005 WL 3489526 at *5 (preserving the "status quo" in the face of the possibility that the government sought to evade Supreme Court reivew).

_____Second, while Respondents apparently deny that the government of Yemen routinely engages in torture, this position is contrary to the views held by experts in the field.  The recent newspaper reports Petitioner cites in his motion are in accord with extensive, historical data from others—including the United States government itself.  On February 28, 2005, the United States State Department issued its 2004 Country Report on Human Rights Practices for Yemen ("2004 Yemen Country Report"), which contained, among other things, the following overall summary: "The Government's human rights record remained poor, and the Government continued to commit numerous abuses. . . . . Security forces arbitrarily continued to arrest, detain, and torture persons. In many cases, the Government failed to hold members of the security forces accountable for abuses. . . . . Prison conditions remained poor. . . . . Despite constitutional constraints, PSO [the Political Security Organization, Yemen's primary state security and intelligence gathering apparatus] and MOI [Ministry of Interior] police officers routinely monitored citizens' activities, searched their homes, detained citizens for questioning, and mistreated detainees.  Prolonged pretrial detention, judicial corruption, and executive interference undermined due process."  2004 Yemen Country Report, attached as Ex. 1, at 1.

The United States State Department's report also laid out various disturbing details. Yemeni torture was explicitly acknowledged.  See, e.g., id. at 1 ("Members of the POS and MOI police forces committed serious human rights abuses, including police beatings, arbitrary arrests,

and detentions without charge."); id. at 2 ("The Constitution prohibits [torture] practices; however, there were reports that members of the PSO and MOI police forces tortured and abused persons in detention.  There were also reports that authorities used force during interrogations, especially against those arrested for violent crimes."); id. at 2-3 ("Illiteracy, lack of training among police, PSO and MOI forces, corruption, and pressure from superiors to produce convictions also played a role in the undue use of force.  The immunity of all public employees from prosecution for crimes allegedly committed while on duty hindered accountability."); id. at 3 ("The Constitution may be interpreted as permitting amputations, in accordance with Shari'a (Islamic law), and physical punishment such as flogging for some crimes, [although none were reported in 2004]").

_____Apart from torture, the State Department recognized various other types of abusive conditions that occur in Yemen.  See id. ("Prison conditions were poor and did not meet internationally recognized standards. . .. Prisons were extremely overcrowded, sanitary conditions were poor, and food and health care were inadequate to nonexistent.  Prison authorities often exacted bribes to obtain privileges, or refused to release prisoners who completed their sentences until family members paid a bribe.").

In evaluating Respondents' comments regarding the importance of foreign countries' laws and "assurances" against torture, it is worth noting that the United States State Department itself has acknowledged Yemen's widespread failures to abide by its own laws and assurances. See id. at 3-4 ("The law prohibits arbitrary arrest and detention; however, the Government generally did not observe these prohibitions.  Enforcement of the law was irregular and in some cases nonexistent, particularly in cases involving security offenses."); id. at 4 ("The law stipulates that a detainee may not be held longer than 7 days without a court order.  Despite these constitutional and other legal provisions, arbitrary arrest and prolonged detention without charge remained common practices."); id. ("'The government must provide attorneys for indigent detainees; however, in practice, this did not always occur. . . . There are provisions for bail;

however, many authorities abided by these provisions only if bribed."); id. ("A large percentage of the total prison population consisted of pretrial detainees, some of whom have been imprisoned for years without charge.").

The State Department's recent report provides little hope that Petitioners' rights will be protected by Yemen's judiciary if Respondents transfer them there.  See id. at 5 ("'The Constitution provides for an 'autonomous' judiciary and independent judges; however, the judiciary was weak and severely hampered by corruption and executive branch interference.  The executive branch appoints judges, removable at the executive's discretion.  There were reports that some judges were harassed, reassigned, or removed from office following rulings against the Government.  Many litigants maintained, and the Government acknowledged, that a judge's social ties and occasional bribery influenced the verdict more than the law or the facts."); id. ("'Citizens and human rights groups alleged that the security forces and judiciary did not observe due process in most cases."); id. at 10 ("Corruption was a problem, particularly in the judicial branch.").  Moreover, even if a Yemeni judge weighs in, additional concerns about the enforceability and the reach of judges' orders persist.  See id. at 4 ("The judiciary was hampered further by the Government's frequent reluctance to enforce judgments."); id. ("The Government failed to ensure that detainees and prisoners were incarcerated only in authorized detention facilities. The Ministry of Interior and the PSO operated extrajudicial detention facilities.").

        This assessment of the state of affairs in Yemen comes from the United States government itself.[5]  Furthermore, non-governmental organizations have long reported on the Yemeni government's practice of torture and other abuses, especially since that country emerged

---

        [5]  In view of these extensive, pointed, and highly negative comments about Yemen made *in a formal United States report*, Respondents' claims that providing Petitioners' counsel with advance notice of an impending transfer will seriously and irreparably undermine United States diplomacy, because Petitioner might suggest that Yemen engages in torture, is disingenuous—even more so given that proceedings involving Petitioners, unlike the United States government's report, would be sealed.

15

from a civil war only about a decade ago.  In a September 2003 report entitled <u>Yemen: The Rule</u>
<u>of Law Sidelined in the Name of Security</u> ("Amnesty International Report on Yemen"), Amnesty
International ("AI") described how Yemen's enforcement of laws against torture had
significantly deteriorated since the September 11, 2001, attacks.  Specifically referencing
detainees held on suspicions of terrorist activity in connection with the U.S.S. Cole and
September 11, 2001, incidents in Yemen, the report noted how "[s]ome detainees said that they
were not tortured . . . but others said they were beaten with electric batons, handcuffed and
shackled, and subjected to insults and verbal abuse.  Others said they were threatened with the
imprisonment of their female relatives if they did not confess." <u>Id</u>. at 8.

AI referenced a statement made by Yemen's Minister of Interior on July 16, 2003, in
which he said that 195 people accused of belonging to Al Qaeda remained detained, but "did not
refer to any judicial process for these detainees because the rule of law has been sidelined.  They
are held totally at the mercy of the government and security forces, far removed from judicial
scrutiny." <u>Id</u>. at 1.  In the weeks and months following this statement by the Minister to Yemen's
Parliament, "[a]rrests were made without the judicial supervision required by law, and detainees
have invariably been subjected to lengthy incommunicado detention, during which some of the
detainees alleged that they were tortured or ill-treated." <u>Id</u>.

Furthermore, Yemen's "authorities, while recognizing that they were in breach of their
international human rights obligations and their own laws, argued that this was because they had
to 'fight terrorism' and avert the risks of military action against Yemen by the US in the wake of
the 11 September events." <u>Id</u>. at 3; <u>see</u> <u>also</u> <u>id</u>. at 6 ("After 11 September, the government's
message to Amnesty International has been articulated as the 'fight against terrorism' to preserve
the security of the country which necessitates action by the arresting authorities beyond the
confines of the law and Yemen's international human rights obligations.").  The Amnesty
International Report on Yemen concludes by noting how "the Yemeni Government has sidelined
the rule of law and its human rights obligations in the name of 'fighting terrorism' and 'national

security.'  It has given the green light to the security forces, particularly the Political Security, to act with impunity in total disregard for the law and the role of the judiciary. . . . What is more disturbing about these human rights violations is that they are being carried out as a deliberate policy by the government."  Id. at 26.  Reports of abuse and torture of detainees in Yemen are widespread, such that the government's attempts to suggest otherwise are, at best, disingenuous.

In fact, it is hard to understand how Respondents can seriously contend that Petitioners' concerns about the potential that they will be tortured are based upon "unfounded speculation."  See Resp. Br. at 12.  Surely the State Department does not base its country reports upon "unfounded speculation."  Nor would Respondents have seen it as being in their interest to claim that they have received "assurances" of humane treatment if petitioners' concerns were based on "unfounded speculation."   The threat of torture is real and undeniable; it is the notion that Respondents' "assurances" have any value that is based upon "unfounded speculation."

Not only is there a strong likelihood that Petitioners will be transferred into the hands of a government that tortures detainees, the need for this Court to grant the requested relief is especially pressing due to the increasing number of accounts in which Respondents have engaged in extraordinary rendition.  According to several news reports, including several cited in Petitioner's Amended Petition for Habeas Corpus, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process.  This practice—known as "rendition," "irregular rendition," or "extraordinary rendition"—is used to facilitate interrogations involving torture.

        Respondents have also engaged in rendition to avoid judicial orders and judgments.  See generally Padilla, 2005 WL 3489526 at *3 (noting that the government's actions in the Padilla case "have given rise to at least an appearance that the purpose of [its] actions may be to avoid consideration of our decision by the Supreme Court").  For example, when another judge of this Court recently found that the allegations of Omar Abu Ali— an American citizen claiming that

17

he was being detained and tortured in Saudi Arabia at the direction of the United States—were sufficiently credible to warrant jurisdictional discovery, see Ali v. Ashcroft, 350 F. Supp.2d 28, 69 (D.D.C. 2004), the United States acted to moot Ali's habeas case by returning him to the United States to face criminal proceedings.  See Daniel Eisenberg, The Rough Justice of War, Time Magazine, Feb. 28, 2005.  Respondents' documented practice of transferring suspects outside the United States substantiates Petitioners' fears of being deprived of United States judicial protection.  Moreover, whether Petitioners are subject to a transfer tomorrow, or next week, or the week after that, is exclusively within Respondents' control.

In sum, there is substantial evidence of Respondents engaging in the practice of rendition, including Respondents' own statement that Respondents will not disclose whether or when such transfers will take place.  Petitioners have presented a sufficiently severe and substantial risk of harm to justify the limited injunctive relief requested here.

**4.    Public Policy Strongly Favors Providing Petitioner With the Requested Notice**

Respondents assert that they, and only they, can determine whether or when a Guantánamo Bay detainee should be transferred to a foreign country—and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the transferee "will" be tortured.  Resp. Br. Ex. A (Waxman Decl. at ¶ 6); Ex. B (Prosper Decl. at ¶ 4).  In other words, Respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy can convince himself that there is only a 50% or less chance that a detainee will be tortured.

Federal courts have repeatedly rejected such claims of unfettered discretion, specifically in the Supreme Court's decision in Rasul, 542 U.S. 466.  As the United States District Court for the District of South Carolina astutely observed in rejecting yet another recent argument for unfettered executive discretion, "[c]ertainly, Respondent does not intend to argue here that, just because the President states that Petitioner's detention is 'consistent with the laws of the United States . . .' that makes it so. Not only is such a statement in direct contravention to the well

18

settled separation of powers doctrine, it is simply not the law." Padilla v. Hanft, Civil Action No. 2:04-2221-26-AJ, Opinion and Order at 18 (D.S.C., filed Feb. 28, 2005).

Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction or into the hands of torturers. For this reason, Respondents' lengthy discussion of extradition proceedings is simply beside the point. See Resp. Br. at 17-20. This is not an "extradition" issue, because Respondents in no way claim that the "renderings" Respondents are utilizing in this context follow the formal extradition process and its attendant procedural protections.

In the alternative, even if extradition bears on Petitioners' challenge to his continued detention, Petitioner has also claimed that his current detention is illegal under United States law, and the Supreme Court has expressly held that this Court has jurisdiction over Petitioner's substantive claims. Rasul, 542 U.S. at 483-85. Thus, whether or not extradition factors into Petitioner's habeas claim, the "rule of non-inquiry" cannot prevent this Court from protecting its jurisdiction over the Petitioners' other substantive claims. Respondents' "extradition" arguments are beside the point.

## B.    Denial of the Motion Would Be Improper Before Discovery

Finally, there can be no doubt—and Respondents do not deny—that this Court may order discovery in a case such as this one. Discovery is uniquely appropriate in this case. Petitioners have been held incommunicado for years without access to family, friends, and counsel. Furthermore, the facts surrounding Petitioners' potential transfer lie exclusively within Respondents' possession. Respondents seek to use their exclusive control of the facts as a weapon, by presenting this Court with generalities of supposed procedures while refusing to disclose any details applicable to Petitioners themselves.

For example, Respondents' declarations provide no details as to how well, when, or even if, these generalized procedures are followed, and provide nothing by which the Court may gauge the accuracy of the Respondents' assertions. However, the generalized procedures that Respondents outline are not the last word on the subject. It has become increasingly plain that United States security agencies have often been given carte blanche with respect to rendition. As recently reported in the New York Times:

> The Bush Administration's secret program to transfer suspected terrorists to foreign countries for interrogation has been carried out by the Central Intelligence Agency under broad authority that has allowed it to act without case-by-case approval from the White House or the State or Justice Departments, according to current and former government officials. The unusually expansive authority for the C.I.A. to operate independently was provided by the White House under a still-classified directive signed by President Bush within days of the September 11, 2001 attacks at the World Trade Center and the Pentagon, the officials said.. . .
>
> In recent weeks, several former detainees have described being subjected to coercive interrogation techniques and brutal treatment during months spent in detention under the program in Egypt and other countries. The official would not discuss specific cases, but did not dispute that there had been instances in which prisoners were mistreated. The official said none had died . . . .
>
> The official refused to say how many prisoners the government had transferred as part of the program. But former government officials say that since the Sept. 11 attacks, the C.I.A. has flown 100 to 150 suspected terrorists from one foreign country to another, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.

Douglas Jehl & David Johnston, Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails, N.Y. Times, Mar. 6, 2005.

A front-page Washington Post article explained that "[t]he system the CIA relies on to ensure that the suspected terrorists it transfers to other countries will not be tortured has been ineffective and virtually impossible to monitor." See Dana Priest, CIA's Assurances on Transferred Suspects Doubted, Wash. Post., Mar. 17, 2005. The article notes how only verbal "assurances" are received from other nations. One C.I.A. official involved with renditions "called the assurances from other countries 'a farce.'" Id. Attorney General Alberto Gonzales was quoted as saying:

20

> [W]e can't fully control what that country might do.  We obviously expect a country to whom we have rendered a detainee to comply with their representations to us.  If you're asking me, 'Does a country always comply?' I don't have an answer to that.

Id.  Of course, there is a certain "beauty" in such answers. As one person interviewed in the article noted, 'It would be stupid [for the United States] to keep track of them because then you would know what's going on.  . . . It's really more like, 'Don't ask, don't tell.'"  Id.

Others do tell, however.  A released detainee revealed how he had been tortured in Egypt for six months after United States officials sent him there—"hung by his arms from hooks, shocked, nearly drowned and brutally beaten."  Id.  One United States official who had visited foreign prisons where suspects had been rendered stated, "It's widely understood that interrogation practices that would be illegal in the U.S. are being used."  Id.  The article noted how "[t]he CIA's Inspector General recently launched a review of the rendition system."  See also Briefing Paper, The United States '"Disappeared": The CIA's Long-Term "Ghost Detainees"", Human Rights Watch (Oct. 2004).

On the topic of "Don't ask, don't tell," Respondents apparently never informed any judge of this Court of Respondent Rumsfeld's February 5, 2005, memorandum before it was reported in the New York Times.  In light of such limited disclosures, it would be inappropriate to give weight or credence to the admittedly generalized declarations Respondents bring to this Court, See Resp. Br. Ex. A (Waxman Decl. at ¶ 1) ("The following statements provide a general overview of the process . . . ."); id. Ex. B (Prosper Decl. at ¶ 1) ("The following statements provide a general overview of the Department of State's role . . . ."), while preventing Petitioner from engaging in discovery to determine when, or if, those procedures are applied.  Despite Respondents' discussions of "policy," and comments about how non-torture assurances are "sought" in every transfer case, id. Ex. B (Prosper Decl. at ¶ 6), both of Respondents' declarants ultimately acknowledge that, at the end of the day, "[d]ecisions on transfer are made on a case-by-case basis."  Resp. Br. Ex. A (Waxman Decl. at ¶ 7).  See also Resp. Br. Ex. B (Prosper Decl.

at ¶ 7) ("Decisions with respect to [the transfer of Guantanamo detainees are made on a case-by-case basis."). And, of course, both declarants speak only of what they know about their own agencies' actions; their comments in no way address the recently-publicized, apparently active role of the CIA in America's rendition process.

Petitioners have established a strong basis for this Court to grant his motion. If this Court is inclined to disagree, it cannot be overlooked that Respondents have sole possession of all the facts needed to successfully challenge a decision to render the Petitioners to the custody of a foreign government, and yet have submitted only generalized, limited declarations. In view of these circumstances, Petitioners request that, if this Court is inclined to deny his motion on the facts and arguments presented here, the Court first allow Petitioners to engage in the limited discovery necessary to support his requests for relief. At a minimum, that discovery should permit Petitioners to serve discovery requiring Respondents' declarants to provide the factual basis underlying their assertions.

Given Petitioners' uncertain status and the government's apparent plans to render them to the custody of a foreign state, Petitioners also respectfully requests that the Court hold an evidentiary hearing on this motion as expeditiously as possible.

## III.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court grant their motion.  The relief Petitioner requests is necessary to ensure that the Court retains jurisdiction over Petitioners' claims, to allow for Petitioners meaningfully to petition this Court, and to prevent the torture of Petitioners.


Dated:  December 27, 2005.                    Respectfully submitted,

                                              /s/ Steven F. Hubachek
                                              /s/ Heather R. Rogers
                                              /s/ Zaki Zehawi
                                              /s/ Ellis M. Johnston
                                              /s/ Reuben Camper Cahn
                                              Steven F. Hubachek (Cal Bar No. 147703)
                                              Heather R. Rogers (Cal. Bar No. 229519)
                                              Zaki Zehawi (Cal. Bar No. 216485)
                                              Ellis M. Johnston, III (Cal. Bar. No. 223664)
                                              Reuben Camper Cahn (Fla. Bar. No. 874299)
                                              Federal Defenders of San Diego, Inc.
                                              225 Broadway, Suite 900
                                              San Diego, California 92101-5008
                                              Telephone:  (619) 234-8467

                                              Counsel for Petitioners