IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| Hicks (Rasul) v. Bush | ) | Case No.  02-CV-0299 (CKK) |
| Al Odah v. United States | ) | Case No.  02-CV-0828 (CKK) |
| Habib v. Bush | ) | Case No.  02-CV-1130 (CKK) |
| Kurnaz v. Bush | ) | Case No.  04-CV-1135 (ESH) |
| Khadr v. Bush | ) | Case No.  04-CV-1136 (JDB) |
| Begg v. Bush | ) | Case No.  04-CV-1137 (RMC) |
| Khalid (Benchellali) v. Bush | ) | Case No. 04-CV-1142 (RJL) |
| El-Banna v. Bush | ) | Case No.  04-CV-1144 (RWR) |
| Gherebi v. Bush | ) | Case No.  04-CV-1164 (RBW) |
| Boumediene v. Bush | ) | Case No. 04-CV-1166 (RJL) |
| Anam v. Bush | ) | Case No.  04-CV-1194 (HHK) |
| Almurbati v. Bush | ) | Case No.  04-CV-1227 (RBW) |
| Abdah v. Bush | ) | Case No.  04-CV-1254 (HHK) |
| Hamdan v. Bush | ) | Case No.  04-CV-1519 (JR) |
| Al-Qosi v. Bush | ) | Case No.  04-CV-1937 (PLF) |
| Paracha v. Bush | ) | Case No.  04-CV-2022 (PLF) |
| Al-Marri v. Bush | ) | Case No.  04-CV-2035 (GK) |
| Zemiri v. Bush | ) | Case No.  04-CV-2046 (CKK) |
| Deghayes v. Bush | ) | Case No.  04-CV-2215 (RMC) |
| Mustapha v. Bush | ) | Case No.  05-CV-0022 (JR) |
| Abdullah v. Bush | ) | Case No.  05-CV-0023 (RWR) |

| | | |
|---|---|---|
| Al-Mohammed v. Bush | ) | Case No.  05-CV-0247 (HHK) |
| El-Mashad v. Bush | ) | Case No.  05-CV-0270 (JR)<br>(Consolidated with 05-CV-833) |
| Al-Adahi v. Bush | ) | Case No.  05-CV-0280 (GK) |
| Al-Joudi v. Bush | ) | Case No.  05-CV-0301 (GK) |
| Al-Wazan v. Bush | ) | Case No.  05-CV-0329 (PLF) |
| Al-Anazi v. Bush | ) | Case No.  05-CV-0345 (JDB) |
| Alhami v. Bush | ) | Case No.  05-CV-0359 (GK) |
| Ameziane v. Bush | ) | Case No.  05-CV-0392 (ESH) |
| Batarfi v. Bush | ) | Case No.  05-CV-0409 (EGS) |
| Sliti v. Bush | ) | Case No.  05-CV-0429 (RJL) |
| Kabir v. Bush | ) | Case No.  05-CV-0431 (RJL) |
| Qayed v. Bush | ) | Case No.  05-CV-0454 (RMU) |
| Al-Shihry v. Bush | ) | Case No.  05-CV-0490 (PLF) |
| Aziz v. Bush | ) | Case No.  05-CV-0492 (JR) |
| Al-Oshan v. Bush | ) | Case No.  05-CV-0520 (RMU) |
| Tumani v. Bush | ) | Case No.  05-CV-0526 (RMU) |
| Al-Oshan v. Bush | ) | Case No.  05-CV-0533 (RJL) |
| Salahi v. Bush | ) | Case No.  05-CV-0569 (JR)<br>(Consolidated with 05-CV-0881)<br>(Consolidated with 05-CV-0995) |
| Mammar v. Bush | ) | Case No.  05-CV-0573 (RJL) |
| Al-Sharekh v. Bush | ) | Case No.  05-CV-0583 (RJL) |
| Magram v. Bush | ) | Case No.  05-CV-0584 (CKK) |

| | | |
|---|---|---|
| Al Rashaidan v. Bush | ) | Case No.  05-CV-0586 (RWR) |
| Mokit v. Bush | ) | Case No.  05-CV-0621 (PLF) |
| Al Daini v. Bush | ) | Case No.  05-CV-0634 (RWR) |
| Errachidi v. Bush | ) | Case No.  05-CV-0640 (EGS) |
| Ahmed v. Bush | ) | Case No.  05-CV-0665 (RWR) |
| Battayav v. Bush | ) | Case No.  05-CV-0714 (RBW) |
| Adem v. Bush | ) | Case No.  05-CV-0723 (RWR) |
| Aboassy v. Bush | ) | Case No.  05-CV-0748 (RMC) |
| Hamlily v. Bush | ) | Case No.  05-CV-0763 (JDB) |
| Imran v. Bush | ) | Case No.  05-CV-0764 (CKK) |
| Al Habashi v. Bush | ) | Case No.  05-CV-0765 (EGS) |
| Al Hamamy v. Bush | ) | Case No.  05-CV-0766 (RJL) |
| Hamoodah v. Bush | ) | Case No.  05-CV-0795 (RJL) |
| Khiali-Gul v. Bush | ) | Case No.  05-CV-0877 (JR) |
| Rahmattullah v. Bush | ) | Case No.  05-CV-0878 (CKK) |
| Mohammad v. Bush | ) | Case No.  05-CV-0879 (RBW) |
| Nasrat v. Bush | ) | Case No.  05-CV-0880 (ESH) |
| Rahman v. Bush | ) | Case No.  05-CV-0882 (GK) |
| Bostan v. Bush | ) | Case No.  05-CV-0883 (RBW) |
| Muhibullah v. Bush | ) | Case No.  05-CV-0884 (RMC) |
| Mohammad v. Bush | ) | Case No.  05-CV-0885 (GK) |
| Wahab v. Bush | ) | Case No.  05-CV-0886 (EGS) |
| Chaman v. Bush | ) | Case No.  05-CV-0887 (RWR) |

| | | |
|---|---|---|
| Gul v. Bush | ) | Case No.  05-CV-0888 (CKK) |
| Basardh v. Bush | ) | Case No.  05-CV-0889 (ESH) |
| Nasrullah v. Bush | ) | Case No.  05-CV-0891 (RBW) |
| Shaaban v. Bush | ) | Case No.  05-CV-0892 (CKK) |
| Sohail v. Bush | ) | Case No.  05-CV-0993 (RMU) |
| Tohirjanovich v. Bush | ) | Case No.  05-CV-0994 (JDB) |
| Al Karim v. Bush | ) | Case No.  05-CV-0998 (RMU) |
| Al-Khalaqi v. Bush | ) | Case No.  05-CV-0999 (RBW) |
| Sarajuddin v. Bush | ) | Case No.  05-CV-1000 (PLF) |
| Kahn v. Bush | ) | Case No.  05-CV-1001 (ESH) |
| Mohammed v. Bush | ) | Case No.  05-CV-1002 (EGS) |
| Mangut v. Bush | ) | Case No.  05-CV-1008 (JDB) |
| Hamad v. Bush | ) | Case No.  05-CV-1009 (JDB) |
| Khan v. Bush | ) | Case No.  05-CV-1010 (RJL) |
| Zuhoor v. Bush | ) | Case No.  05-CV-1011 (JR) |
| Ali Shah v. Bush | ) | Case No.  05-CV-1012 (ESH) |
| Salaam v. Bush | ) | Case No.  05-CV-1013 (JDB) |
| Al-Hela v. Bush | ) | Case No.  05-CV-1048 (RMU) |
| Mousovi v. Bush | ) | Case No.  05-CV-1124 (RMC) |
| Khalifh v. Bush | ) | Case No.  05-CV-1189 (JR) |
| Zalita v. Bush | ) | Case No.  05-CV-1220 (RMU) |
| Ahmed v. Bush | ) | Case No.  05-CV-1234 (EGS) |
| Aminullah v. Bush | ) | Case No.  05-CV-1237 (ESH) |

| | | |
|---|---|---|
| Ghalib v. Bush | ) | Case No.  05-CV-1238 (CKK) |
| Al Khaiy v. Bush | ) | Case No.  05-CV-1239 (RJL) |
| Bukhari v. Bush | ) | Case No.  05-CV-1241 (RMC) |
| Pirzai v. Bush | ) | Case No.  05-CV-1242 (RCL) |
| Peerzai v. Bush | ) | Case No.  05-CV-1243 (RCL) |
| Alsawam v. Bush | ) | Case No.  05-CV-1244 (CKK) |
| Mohammadi v. Bush | ) | Case No.  05-CV-1246 (RWR) |
| Al Ginco v. Bush | ) | Case No.  05-CV-1310 (RJL) |
| Ullah v. Bush | ) | Case No.  05-CV-1311 (RCL) |
| Al Bihani v. Bush | ) | Case No.  05-CV-1312 (RJL) |
| Mohammed v. Bush | ) | Case No.  05-CV-1347 (GK) |
| Saib v. Bush | ) | Case No.  05-CV-1353 (RMC) |
| Hatim v. Bush | ) | Case No.  05-CV-1429 (RMU) |
| Al-Subaiy v. Bush | ) | Case No.  05-CV-1453 (RMU) |
| Dhiab v. Bush | ) | Case No.  05-CV-1457 (GK) |
| Ahmed Doe v. Bush | ) | Case No.  05-CV-1458 (ESH) |
| Sadkhan v. Bush | ) | Case No.  05-CV-1487 (RMC) |
| Faizullah v. Bush | ) | Case No.  05-CV-1489 (RMU) |
| Faraj v. Bush | ) | Case No.  05-CV-1490 (PLF) |
| Khan v. Bush | ) | Case No.  05-CV-1491 (JR) |
| Ahmad v. Bush | ) | Case No.  05-CV-1492 (RCL) |
| Amon v. Bush | ) | Case No.  05-CV-1493 (RBW) |
| Al Wirghi v. Bush | ) | Case No.  05-CV-1497 (RCL) |

| | | |
|---|---|---|
| Nabil v. Bush | ) | Case No.  05-CV-1504 (RMC) |
| Al Hawary v. Bush | ) | Case No.  05-CV-1505 (RMC) |
| Shafiiq v. Bush | ) | Case No.  05-CV-1506 (RMC) |
| Kiyemba v. Bush | ) | Case No.  05-CV-1509 (RMU) |
| Idris v. Bush | ) | Case No.  05-CV-1555 (JR) (Consolidated with 05-CV-1725) |
| Attash v. Bush | ) | Case No.  05-CV-1592 (RCL) |
| Al Razak v. Bush | ) | Case No.  05-CV-1601 (GK) |
| Mamet v. Bush | ) | Case No.  05-CV-1602 (ESH) |
| Rabbani v. Bush | ) | Case No.  05-CV-1607 (RMU) |
| Zahir v. Bush | ) | Case No.  05-CV-1623 (RWR) (Consolidated with 05-CV-01236) |
| Akhtiar v. Bush | ) | Case No.  05-CV-1635 (PLF) |
| Ghanem v. Bush | ) | Case No.  05-CV-1638 (CKK) |
| Albkri v. Bush | ) | Case No.  05-CV-1639 (RBW) |
| Al-Badah v. Bush | ) | Case No.  05-CV-1641 (CKK) |
| Almerfedi v. Bush | ) | Case No.  05-CV-1645 (PLF) |
| Zaid v. Bush | ) | Case No.  05-CV-1646 (JDB) |
| Al-Bahooth v. Bush | ) | Case No.  05-CV-1666 (ESH) |
| Al-Siba'i v. Bush | ) | Case No.  05-CV-1667 (RBW) |
| Al-Uwaidah v. Bush | ) | Case No.  05-CV-1668 (GK) |
| Al-Jutaili v. Bush | ) | Case No.  05-CV-1669 (TFH) |
| Ali Ahmed v. Bush | ) | Case No.  05-CV-1678 (GK) |
| Khandan v. Bush | ) | Case No.  05-CV-1697 (RBW) |

| | | |
|---|---|---|
| Kabir (Sadar Doe) v. Bush | ) | Case No. 05-CV-1704 (JR) |
| Al-Rubaish v. Bush | ) | Case No. 05-CV-1714 (RWR) |
| Qasim v. Bush | ) | Case No. 05-CV-1779 (JDB) |
| Sameur v. Bush | ) | Case No. 05-CV-1806 (CKK) |
| Al-Harbi v. Bush | ) | Case No. 05-CV-1857 (CKK) |
| Aziz v. Bush | ) | Case No. 05-CV-1864 (HHK) |
| Hamoud v. Bush | ) | Case No. 05-CV-1894 (RWR) |
| Al-Qahtani v. Bush | ) | Case No. 05-CV-1971 (RMC) |
| Alkhemisi v. Bush | ) | Case No. 05-CV-1983 (RMU) |
| Gamil v. Bush | ) | Case No. 05-CV-2010 (JR) |
| Al-Shabany v. Bush | ) | Case No. 05-CV-2029 (JDB) |
| Othman v. Bush | ) | Case No. 05-CV-2088 (RWR) |
| Ali Al Jayfi v. Bush | ) | Case No. 05-CV-2104 (RBW) |
| Jamolivich v. Bush | ) | Case No. 05-CV-2112 (RBW) |
| Al-Mudafari v. Bush | ) | Case No. 05-CV-2185 (JR) |
| Al-Mithali v. Bush | ) | Case No. 05-CV-2186 (ESH) |
| Al-Asadi v. Bush | ) | Case No. 05-CV-2197 (HHK) |
| Alhag v. Bush | ) | Case No. 05-CV-2199 (HHK) |
| Nakheelan v. Bush | ) | Case No. 05-CV-2201 (ESH) |
| Al Subaie v. Bush | ) | Case No. 05-CV-2216 (RCL) |
| Ghazy v. Bush | ) | Case No. 05-CV-2223 (RJL) |
| Al-Shimrani v. Bush | ) | Case No. 05-CV-2249 (RMC) |
| Amin v. Bush | ) | Case No. 05-CV-2336 (PLF) |

Al Sharbi v. Bush                    )     Case No.  05-CV-2348 (EGS)

Ben Bacha v. Bush                    )     Case No.  05-CV-2349 (RMC)

Zadran v. Bush                       )     Case No.  05-CV-2367 (RWR)

Alsaaei v. Bush                      )     Case No.  05-CV-2369 (RWR)

Razakah v. Bush                      )     Case No.  05-CV-2370 (EGS)

Al Darbi v. Bush                     )     Case No.  05-CV-2371 (RCL)

Haleem v. Bush                       )     Case No.  05-CV-2376 (RBW)

Al-Ghizzawi v. Bush                  )     Case No.  05-CV-2378 (JDB)

Awad v. Bush                         )     Case No.  05-CV-2379 (JR)

Al-Baidany v. Bush                   )     Case No.  05-CV-2380 (CKK)

Al Rammi v. Bush                     )     Case No.  05-CV-2381 (JDB)

Said v. Bush                         )     Case No.  05-CV-2384 (RWR)

Al Halmandy v. Bush                  )     Case No. 05-CV-2385 (RMU)

Mohammon v. Bush                     )     Case No.  05-CV-2386 (RBW)

Al-Quhtani v. Bush                   )     Case No.  05-CV-2387 (RMC)

Thabid v. Bush                       )     Case No.  05-CV-2398 (ESH)

Al Yafie v. Bush                     )     Case No.  05-CV-2399 (RJL)

Rimi v. Bush                         )     Case No.  05-CV-2427 (RJL)

Almjrd v. Bush                       )     Case No.   05-CV-2444 (RMC)

Al Salami v. Bush                    )     Case No.  05-CV-2452 (PLF)

Al Shareef v. Bush                   )     Case No.  05-CV-2458 (RWR)

Khan v. Bush                         )     Case No.  05-CV-2466 (RCL)

Hussein v. Bush                      )     Case No.  05-CV-2467 (PLF)

| | | |
|---|---|---|
| Al-Delebany v. Bush | ) | Case No.  05-CV-2477 (RMU) |
| Al-Harbi v. Bush | ) | Case No.  05-CV-2479 (HHK) |
| Feghoul v. Bush | ) | Case No. 06-CV-0618 (RWR) |
| Rumi v. Bush | ) | Case No. 06-CV-0619 (RJL) |

_____

## RESPONDENTS' MOTION FOR PROCEDURES
## RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS
## <u>AND REQUEST FOR EXPEDITED BRIEFING</u>[1]

Respondents hereby respectfully submit this motion and memorandum to inform the

Court and counsel regarding the disposition of certain materials associated with Guantanamo

detainees, including petitioners, that have been impounded for purposes of an ongoing

investigation by the Naval Criminal Investigative Service ("NCIS") into the circumstances of the

recent suicides of three detainees, as well as any broader plot or planning for other such attempts

in the past or future.  Respondents also request that the Court establish procedures authorizing

the review of impounded materials that may have been created by detainees to provide to their

counsel, or that may have been provided to detainees by their counsel, and therefore may

potentially be subject to privilege.  Respondents also seek an expedited briefing schedule

regarding this matter.

As explained below, respondents seek authorization for a "Filter Team" that would

review the impounded materials.  That Filter Team will be composed of Department of Defense

attorneys and other personnel and translators who have not and will not take part in litigation or

_____

[1] This filing also serves as respondents' opposition to petitioner's Motion to Modify Stay
to Direct Respondents to Return Impounded Privileged Legal Material, filed July 5, 2006, in
*Abdullah v. Bush*, No. 05-CV-0023 (RWR).

other proceedings involving detainees, and who will operate under appropriate nondisclosure

obligations.  Once authorized, the Filter Team will identify documents relevant to the ongoing

investigation such that any relevant but potentially privileged materials will remain privileged

pending the Court's consideration of privilege issues with respect to those materials.

For the reasons explained below, the Court should authorize the inclusion of attorney-

client communications in the review of detainee materials by the Filter Team.[2]  Furthermore,

given that the ongoing investigation pertains to the safety and security of detainees and personnel

at Guantanamo Bay and should be permitted to proceed expeditiously, the Court is requested to

require that petitioners file any response to this motion within ten (10) calendar days, *i.e.*, July

17, 2006, with respondents' reply due July 21, 2006.[3]

---

[2] The ongoing NCIS investigation will involve review of materials of all Guantanamo Bay detainees, except those who have been classified as no longer enemy combatants ("NLECs").  Accordingly, respondents are filing this motion in all of the pending Guantanamo detainee *habeas* cases, including those currently on appeal, with the exception of the four cases that exclusively involve NLECs.  *See Qassim v. Bush*, 05-CV-497 (JR); *Mamet v. Bush*, 05-CV-1886 (EGS); *Zakirjan v. Bush*, 05-CV-2053 (HHK); *Muhammed v. Bush*, 05-CV-2087 (RMC). A fifth case – *El-Mashad v. Bush*, 05-CV-270 (JR) – involves both enemy combatant and NLEC detainees, thus the motion in that case is directed only with respect to the enemy combatant detainees (Adel Fattouh Aly Alhmed Algazzar and Sherif El-Mashad).

[3] This motion is without prejudice to respondents' position that the Court lacks jurisdiction in these cases, aside from *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), in light of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 ("the Act").  The Act, among other things, amends 28 U.S.C. § 2241 to eliminate court jurisdiction to consider *habeas* petitions and other claims by aliens held as enemy combatants at Guantanamo Bay, *id.* §1005(e)(1), and to create an exclusive review mechanism in the D.C. Circuit to address the validity of the detention of such aliens and final decisions of any military commissions, *id.* § 1005(e)(1), (e)(2), (e)(3).  Section 1005(e)(2) of the Act states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.  While the Supreme Court in *Hamdan*, held that § 1005(e)(1) did not apply to habeas petitions pending prior to the enactment of the Act, it recognized that the exclusive review provisions of the Act did expressly apply to cases pending

## BACKGROUND

On June 10, 2006, three detainees at the U.S. Naval Base at Guantanamo Bay, Cuba, were

found in their cells, each apparently having committed suicide using torn bedsheets as ligatures

to hang themselves.  *See, e.g.*, Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent*

*Suicide, at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html.  These suicides

---

prior to enactment.  *See Hamdan v. Rumsfeld*, 548 U.S. ---, slip op. at 7-20 (U.S. June 29, 2006).
While the petitioner in *Hamdan* escaped the Act by virtue of the fact that his challenge did not
involve a final decision of a military commission within the exclusive jurisdiction of the Court of
Appeals under § 1005(e)(3), the Court reserved the question of the effect of the exclusive review
provisions of the Act on other cases, stating that "[t]here may be habeas cases that were pending
in the lower courts at the time the DTA was enacted that do qualify as challenges to 'final
decision[s]' within the meaning of subsection (e)(2) or (e)(3).  We express no view about
whether the DTA would require transfer of such an action to the District of Columbia Circuit."
*Hamdan*, slip op. at 18 n.14.  The cases at bar, aside from *Hamdan*, are just such cases, *i.e.*,
challenges to petitioners' designation as enemy combatants through Combatant Status Review
Tribunals, and given the Act's investment of exclusive review in the Court of Appeals, the
District Court lacks jurisdiction over the cases for it is well-settled that an exclusive-review
scheme, where applicable, precludes the exercise of jurisdiction under more general grants of
jurisdiction, including *habeas corpus*.  *Cf.*, *e.g.*, 5 U.S.C. § 703 ("form of proceeding for judicial
review is the special statutory review proceeding relevant to the subject matter in a court
specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action,
including actions for . . . writs of . . . habeas corpus"); *Thunder Basin Coal Co. v. Reich*, 510
U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of
district court jurisdiction); *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984)
(Hobbs Act) ("The appropriate procedure for obtaining judicial review of the agency's
disposition of these issues was appeal to the Court of Appeals as provided by statute."); *Laing v.
Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in
which no other judicial remedy is available"); *Lopez v. Heinauer*, 332 F.3d 507, 511 (8th Cir.
2003) ("Because judicial review was available . . . the district court was not authorized to hear
this § 2241 habeas petition.").  *See also Telecommunications Research and Action Center v.
FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that
statutory jurisdiction is 'exclusive' . . . , a statute which vests jurisdiction in a particular court
cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote
omitted); *id*. at 75, 78-79 (request for relief in district court that might affect Court of Appeals'
future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).

The effect of the *Hamdan* decision on this Court's jurisdiction is pending before the
Court of Appeals, and respondents have requested supplemental briefing on the subject.

followed an incident less than a month before (on May 18, 2006) in which two detainees overdosed on medications that they had illicitly hoarded during medical treatment and responses to sick calls regularly provided by Guantanamo staff. *See*, *e.g.*, Kathleen T. Rhem, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, *at* http://www.defenselink.mil/news/May2006/20060519_5177.html. On the same day as the May 18 overdose incident, a number of detainees in Camp 4, a communal housing facility at Guantanamo, ambushed and attacked guards using weapons fashioned from fans and other materials in the housing bay. *Id.* In addition, recent searches of detainees' cells at Guantanamo have uncovered other hoarding of medicines, including in detainees' waistbands and even in a detainee's prosthetic limb. *See* Carol J. Williams, *Commander: Suicide Plots Continuing*, Miami Herald, June 28, 2006, at 7A, *at* *http://www.miami.com/mld/miamiherald/news/nation/14920247.htm*.

     ***The NCIS Investigation.*** Because the U.S. Navy has primary jurisdiction over Guantanamo Bay, the NCIS began an investigation to determine the circumstances and cause of death with respect to the recent suicides. *See* Declaration of Rear Admiral Harry B. Harris ¶ 2 ("Harris Decl.") (attached hereto as Exhibit A)[4]; Declaration of Special Agent in Charge Carol Kisthardt ¶ 2 ("Kisthardt Decl.") (attached hereto as Exhibit B). The NCIS is the primary criminal investigative service of the Navy, and it investigates all deaths associated in any way with the Navy. *See* SECNAV Instruction 5430.107, Mission and Functions of the Naval Criminal Investigation Service ¶ 6, *at* neds.daps.dla.mil/directives/5430_107.pdf. The NCIS

---

[4] Admiral Harris serves as Commander, Joint Task Force-Guantanamo, the entity responsible for detention operations at Guantanamo in support of the Global War on Terrorism. Harris Decl. ¶ 1.

conducts its investigations and mission independently. *Id.* Commands with matters under investigation must assist the investigation and provide support as needed; moreover, commands may not impede or interfere with such investigations. *Id.*

The NCIS investigation began with searches of the cells of the deceased detainees. *See* Kisthardt Decl. ¶ 3. Handwritten notes were found on the detainees that appeared to be suicide notes. *Id.* NCIS also discovered a handwritten note hidden in the mesh wall of one of the deceased detainee's cell; when translated, that note proved to be related to the suicides, but it appeared to be written by someone other than the detainee who died in the cell in which the note was found. *Id.* That particular note was written on notepaper that was stamped on the back as privileged attorney-client material. *Id.* In that vein, JTF-Guantanamo authorities, until recently, have permitted *habeas* counsel to provide represented detainees with paper on which detainees could draft letters to counsel. Presumably, the stamped paper used for the suicide note was something provided by one of the *habeas* counsel, although the two deceased detainees who had been identified as putative *habeas* petitioners, *see* Notice, *Al-Harbi v. Bush*, 05-CV-1857 (CKK) (dkt. no. 21); Notice, *Al-Salami v. Bush*, 05-CV-2452 (PLF) (dkt. no. 16), had never been visited by *habeas* counsel. It seems likely, therefore, that the stamped paper had been supplied to the deceased detainees by other detainees.

Upon the discovery of these notes, which indicated the passing of materials and messages between detainees and that some level of planning or coordination of the suicides had taken place, NCIS investigators expanded their search to the other occupied cells in the same cell block of the deceased detainees for additional evidence regarding the circumstances of the deaths of the three detainees, including handwritten notes reflecting suicide notes or possible suicide pacts.

- 5 -

Kisthardt Decl. ¶ 3.  That search uncovered notes found in a living detainee's cell that, once translated, appeared to have been written by at least two of the deceased detainees and, thus, were relevant to the NCIS investigation.  These notes were hand-written, in Arabic, on stationery that had been stamped as confidential attorney-client materials.  *Id.*

The discovery of these materials led the NCIS to expand its investigatory efforts to include all materials in all enemy combatant detainees' cells, in order to investigate fully the circumstances surrounding the deaths of the three detainees and to determine whether other suicides were planned or likely to be planned.[5]  *Id.* ¶ 3.  On or about June 14, 2006, the NCIS impounded detainees' written materials, most of which were contained in the plastic bins in which detainees are permitted to store their personal items and papers, including any legal material and other correspondence.[6]  *See id.*  (Detainees' Korans and the like were not impounded.)  Approximately 1,100 pounds of materials were collected, much of which was

---

[5] Documents of the three remaining detainees who have been classified as no longer enemy combatants have not been impounded and are not currently the subject of investigation. *See supra* note 2.

[6] Typically, detainees who are housed in cells are limited in the amount of material they may have in their cells at any particular time; thus, the plastic bins are kept outside a detainee's cell, and the detainee may request items from the bin, and return items to the bin, through the guards on duty in the cell block.  In Camp 4, however, detainees are housed in open bays, not cells, and have unrestricted access to their personal bins.

With respect to a number of the bins belonging to detainees who were in Camp 4 at the time of the May 18, 2006 disturbance in the camp, it should be noted that during the melee between the detainees and guard personnel, a number of detainee bins were disrupted and their contents scattered.  During clean-up after the incident by Guantanamo personnel, materials, including some legal materials, were found to have been contaminated with biologically hazardous matter, such as feces and bodily fluids, that were used by detainees in the attack on the guards.  These contaminated materials were destroyed for health and safety reasons.  Also, a number of the scattered legal materials were not readily identifiable as pertaining to a particular detainee such that they could be returned to a detainee's bin.

written in languages other than English. *Id*. ¶¶ 4-5. The materials collected from each detainees'

cell and effects were separately bagged for eventual sorting and review. *Id.* ¶ 4. Once the

materials were gathered, on June 18, 2006, NCIS personnel began sorting materials from bags

pertaining to eleven detainees. *Id.* ¶ 5. This process involved separating privileged information

from non-privileged and conducting a preliminary scan of non-privileged materials for relevancy

to the investigation. *Id.* ¶ 5. Almost immediately, the sorting process revealed documents of

interest. A document containing instructions on tying knots was discovered. Further, the review

recovered a JTF-Guantanamo- generated e-mail containing information regarding cell locations

of detainees and other details regarding camp operational matters – information that typically

would be classified or otherwise sensitive. *Id*. The latter discovery led investigators to examine

other materials from the same detainee to determine whether there were other potentially

classified U.S. Government documents in the detainee's possession, including in three envelopes

that were marked as attorney-client privileged information. *Id*. An NCIS investigator scanned

the contents of the three envelopes to see that one of them contained a document with a "Secret"

classification marking that was lined out and marked "Unclassified." *Id*. A second envelope

contained a typed document stamped "FOUO," *i.e.*, For Official Use Only, a designation for

materials typically subject to special handling. *Id*. The documents in the third envelope did not

bear any classification or special handling markings. *Id*. The NCIS investigators, however, did

not read the contents of any of the documents in the three envelopes. *Id*.

     The initial sorting process of the bags pertaining to the eleven detainees made clear that

review and translation of the collected detainee materials would be a burdensome undertaking

given the volume of materials and the apparent multitude of foreign languages. *Id*. Further, the

sorting process revealed the likelihood that actual attorney-client communications would be encountered. *See id.* Accordingly, further review of the materials was suspended until appropriate procedures and staffing could be developed appropriate for the scope of the undertaking and accounting for the possibility of the review team encountering potentially privileged attorney-client communications. *Id.*

The materials uncovered in these initial searches comprising a very small amount of detainee materials demonstrated, however, that detainees had developed practices for misusing the existence of a privileged attorney-client communication system, presumably to shield the communications from the suspicion or scrutiny of JTF-Guantanamo guards, who have not been permitted to inspect or review attorney-client communications. Detainees had further developed ways of obtaining documents like the JTF-Guantanamo e-mail discovered.

After learning of the developments in the NCIS investigation, and in order to help prevent any additional loss of life and ensure the safety of detainees and military personnel at Guantanamo, Admiral Harris, the Commander, JTF-Guantanamo, determined that there was a need for a complete investigation addressing fully the circumstances of the suicides, including whether a coordinated plan existed for the suicides involving the encouragement, assistance, or direction of other detainees or individuals, as well as the existence of any other plots or plans for additional detainee suicides. *See* Harris Decl. ¶ 4. The Commander requested that NCIS include these matters within its investigation, and NCIS is proceeding consistent with the request. *Id.*

**Procedures for Review of Detainee Documents.** A major component of the current investigation is the review of the currently impounded detainee materials. Those materials, at least in cases in which the Protective Order applicable in other Guantanamo detainee *habeas*

cases has been entered,[7] will likely include some number of attorney-client communications potentially subject to attorney-client privilege.

Because the Protective Order contemplates that communications between *habeas* counsel and their clients "for purposes of litigating the cases" generally take place in a privileged context,[8] the Government intends that the review of all of the impounded materials be performed

---

[7] *See* Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order in *In re Guantanamo Detainee Cases*, No. 02-CV-0299, *et al.* (D.D.C. Dec. 13, 2004); Order Addressing Designation Procedures for "Protected Information" in *In re Guantanamo Detainee Cases*, No. 02-CV-0299, *et al.* (D.D.C. Nov. 10, 2004).

[8] *See* Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba, § I (annexed to the Protective Order as Exhibit A) ("Access Procedures"). The Access Procedures permit privileged counsel visits and privileged "legal mail" between counsel and a represented petitioner for purposes of litigating these cases, where "legal mail" is defined as

> Letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly filed legal documents relating to that representation.

*Id.* § II.E. In several of the Guantanamo cases, however, the parties have agreed to revisions to the Access Procedures that contemplate substantive review by a DoD privilege team, and potentially other JTF-Guantanamo personnel, of articles and publications intended to be provided by counsel to detainees. *See* Stipulation and Order filed May 3, 2006 in *Al Joudi v. Bush*, No. 05-CV-301 (GK); *Al Oshan v. Bush*, No. 05-520 (RMU); *Al Subaiy v. Bush*, No. 05-CV-1453 (RMU); *Al Shareef v. Bush*, No. 05-2458 (RWR).

Counsel, however, are not permitted to share classified information or information designated by the Government as "protected information" with detainees. *See* Protective Order ¶¶ 30, 39. Further, neither counsel nor detainees are permitted to use the privileged mail system for non-legal mail or communications, including communications to/from detainees from/to others besides their counsel; the Access Procedures contemplate and require that non-legal communications be routed through the normal mail process at Guantanamo Bay, which includes content screening maintained for national security, intelligence, and physical and personnel security purposes. *See* Access Procedures § IV.B.4.-5. (counsel may not use legal mail channels

by a "Filter Team." The Filter Team will be composed of individuals meeting the qualifications

of the DoD "Privilege Team" created by the Protective Order,[9] that is, they will be DoD

"attorney[s], intelligence, or law enforcement personnel [or translators] who have not taken part

in, and, in the future, will not take part in, any domestic or foreign court, military commission or

combatant status tribunal proceedings involving the detainee." *See* Access Procedures § II.D. At

present, it is anticipated that the Filter Team will be composed of Navy JAG attorneys assisted by

DoD translators as necessary, but, again, only those who have not taken part in and will not take

part in litigation and other proceedings pertaining to the detainees. It is anticipated that the Filter

Team will disclose to NCIS investigators any documents it discovers that would be relevant to

the NCIS investigation, while documents determined not to be relevant to the investigation will

_____

as conduit for non-legal mail; non-legal mail subject to review by military); *see also id.* § VI.C.
(messages to others besides counsel to be processed as non-legal mail); § IV.A.5. (non-legal mail
communications to detainees to be sent to detainee through normal, non-privileged mail
channels). Furthermore, counsel are required to disclose to the Government any information
learned from a detainee involving future events that threaten national security or involve
imminent violence. *Id.* § IX.C.

[9] In recognition of the unique, wartime setting of these cases and detentions, including
that information possessed by detainees could have national security or physical and personnel
security implications warranting potential treatment of the information as classified information,
the Access Procedures require that communications from detainees and information learned from
them be treated as presumptively classified. *See* Access Procedures §§ III.A., IV.A.6., VI.
Counsel, however, may submit such materials to the DoD Privilege Team for review to
determine its classification. *See* Access Procedures §§ IV.A.6., VII. The Privilege Team is "[a]
team comprised of one or more DoD attorneys and one or more intelligence or law enforcement
personnel who have not taken part in, and, in the future, will not take part in, any domestic or
foreign court, military commission or combatant status tribunal proceedings involving the
detainee." *Id.* § II.D. Absent Court authorization or the consent of counsel submitting the
information to the Privilege Team, the Privilege Team cannot disclose to anyone information
learned from their review activities, except that the Privilege Team may disclose information
indicating an "immediate and substantial harm to national security" or "imminent acts of
violence" to officials with a role in responding to such potential harms or violence. *See id.*
§ VII. A., D.-F.

be returned, either to the detainee if privileged attorney-client communication or, otherwise, to JTF-Guantanamo for appropriate action.

With respect to attorney-client communications potentially subject to privilege, the Court should authorize review of such materials by the Filter Team. To the extent that documents are determined upon such review to be relevant to the NCIS investigation, the Filter Team would seek Court permission for disclosure of the documents to the NCIS investigators; in such proceedings, the applicability of the attorney-client privilege, and any applicable exception, could be considered and addressed by the Court. Documents determined not to be relevant to the NCIS investigation would be returned to the detainee concerned.[10] This protocol, however, should be without prejudice to the Filter Team disclosing the material without such notice in appropriate circumstances, *e.g.*, when the information pertains to future events that threaten national security or involve imminent violence, situations in which the current Access Procedures already contemplate and require disclosure of the relevant information to JTF-Guantanamo. *See* Access Procedures § VII. A., D.-F (DoD Privilege Team permitted to disclose such information

---

[10] It is further contemplated that because the applicable Protective Order and Access Procedures prohibit *habeas* counsel from sharing of certain types of materials with detainees – *see supra* note 8 (counsel may neither share classified or protected materials with detainees nor deliver communications between detainees and others through legal mail channels); *see also* Access Procedures §§ IV.A.7, V.B. (counsel prohibited from providing detainees information relating to "ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation") – if such prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action. *See* Protective Order ¶ 49 (violations of Protective Order to be brought to Court's attention); *cf. id.* ¶ 28 (Court Security Officers to report violations of Protective Order discovered in administration of secure facility for *habeas* counsel).

discovered in documents during classification review); *id.* § IX.C (petitioners' counsel required to disclose such information learned from a detainee).

Because the review by the Filter Team may require the Filter Team to raise disclosure of specific attorney-client communications with the Court, it is necessary that the Court also authorize a Filter Litigation Team to represent the Filter Team in such matters. The Filter Team, comprising DoD employees, cannot appear in court on its own to represent itself, *see* 28 U.S.C. § 516,[11] and it obviously could not share potentially privileged information learned during its review with current litigation counsel for respondents – even for the purpose of permitting current litigation counsel to defend or represent the Filter Team. The Filter Team should be permitted to disclose potentially privileged or protected information to the Filter Litigation Team, which would operate under the same type of constraints on disclosure of the information as the Filter Team. Similarly, because of the Filter Litigation Team's access to potentially privileged information, the Filter Litigation Team would be composed of Department of Justice attorneys who would be prohibited from participating in litigation on the merits of the *habeas* petitions of Guantanamo Bay detainees or other cases brought by or against the petitioners.

A proposed order regarding the matters and procedures set out above for which Court authorization or approval is appropriate is submitted herewith. Review of the impounded documents awaits the Court's consideration of this motion.

---

[11] 28 U.S.C. § 516 provides:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

## ARGUMENT

The legitimacy of and need for the temporary impoundment and review of detainee papers in the course of the NCIS investigation cannot be gainsaid in the current context.  Three detainees have committed suicide, with two others having attempted to do so in the preceding weeks.  Detainees in Camp 4 were able to launch a coordinated ambush attack on guards there. The three successful suicides occurred on the same day, in essentially the same manner, and evidence exists that the deceased detainees had secreted suicide notes between themselves and at least one other living detainee.  In addition, a note providing instructions concerning the tying of knots has been uncovered among detainee documents, along with a potentially classified e-mail from a camp officer somehow provided a detainee.  Importantly, several of the suicide notes and other documents were written or contained on paper bearing an attorney-client confidentiality stamp, indicating, at the very least, that detainees are (mis)using materials on their face reserved for privileged legal communications for purposes other than such communications.  No doubt this practice was developed in an attempt to shield those improper communications or writings and others like them from the suspicion of guard force personnel or from scrutiny by those personnel because guards have not been permitted to review or interfere with attorney-client communications between detainees and counsel.  Further, detainees apparently have developed some means of obtaining documents like the JTF-Guantanamo e-mail found in the sample sorting of detainee documents.

The Supreme Court has long recognized, even in the context of the detention of U.S. individuals possessing constitutional rights, that prison officials must be permitted to take all reasonable steps to mitigate and address potential threats to the security of detention facilities and the safety of personnel and detainees in those facilities, including with respect to searches of

detainee quarters and materials. *See*, *e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 555-57 (1979)

(upholding, *inter alia*, security-related searches of cells and persons of prisoners); *Hudson v.*

*Reno*, 468 U.S. 517 (1984) (upholding random shake-down searches of prisoner cells outside of

prisoner's presence); *Block v. Rutherford*, 468 U.S. 576 (1984) (same with respect to pretrial

detainees); *see also Turner v. Safley*, 482 U.S. 78 (1987) (prison practice impinging on prisoner's

constitutional right is nonetheless valid if reasonably related to legitimate penological interests).

Such deference should apply with even greater force with respect to actions taken in response to

specific security issues raised at a military detention facility such as Guantanamo during a time of

war, including where, as here, the security issues bear the hallmarks of coordinated planning by

detainees against their captors. *See Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2640 (2004) (plurality

opinion) ("The capture and detention of lawful combatants and the capture, detention, and trial of

unlawful combatants is to prevent captured individuals from returning to the field of battle and

taking up arms once again."). *See also Hamdi*, 124 S. Ct. at 2647 (plurality opinion) (stating that

"[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in

the hands of those who are best positioned and most politically accountable for making them");

*Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005) (Walton, J.) (indicating that "it is a

fundamental principle under our Constitution that deference to the Executive Branch must be

afforded in matters concerning the military and national security matters."); *Khalid v. Bush*, 355

F. Supp. 2d 311, 328 (D.D.C. 2005) (Leon, J.) (explaining that management of wartime

detainees' confinement conditions is the province of the Executive and Legislative branches, thus

precluding judicial scrutiny of such conditions), *appeal pending*.

    The Court, accordingly, should authorize review of the collected detainee materials by the

Filter Team to the extent such materials include attorney-client communications, and should

establish a procedure under which, to the extent that documents are determined upon such review

to be relevant to the NCIS investigation, the Filter Team seeks Court permission for disclosure of

the documents to the NCIS investigators. As explained below, such review, for the purposes of

identifying documents that may be relevant to investigation of the complete circumstances of the

recent suicides, including whether a coordinated plan existed for the suicides involving the

encouragement, assistance, or direction of other detainees or individuals, as well as the existence

of any other plots or plans for additional detainee suicides, is reasonable in light of the evidence

uncovered to date of abuse of the attorney-client correspondence system by detainees.

### A.    Authorization of Filter Team Review of Attorney-Client Materials is Warranted.

The extraordinary circumstances of the situation with respect to the Guantanamo

detainees warrants Court authorization of the Filter Team review of any attorney-client

communications between counsel and petitioners contained in the detainee documents to be

reviewed. The attorney-client privilege, while venerable, is not without limits. It, of course,

applies only to communications between lawyer and client for purposes of legal representation.

*See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). The privilege further "'is based

in policy, rather than in the Constitution, and therefore cannot stand in the face of countervailing

law or strong public policy and should be strictly confined within the narrowest possible limits

underlying its purpose.'" *See United States v. Grant*, 2004 WL 1171258 at *2 (S.D.N.Y. May 25,

2004) (quoting *United States v. Stewart*, 2002 WL 1300059 at * 5 (S.D.N.Y. Jan. 11, 2002) and

*United States v. Golberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991)); *cf. United States v.

Skeddle*, 989 F. Supp. 890, 900 (N.D. Ohio 1997) (discussing state law privilege); *Leonen v.

Johns-Manville*, 135 F.R.D. 94, 100 (D.N.J 1990) (same). Thus, for example, the privilege,

- 15 -

though otherwise applicable, does not apply to communications made in furtherance of committing a crime or tort. *See United States v. Zolin*, 491 U.S. 554, 562-63 (1989); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). In addition, the Access Procedures further limit the privilege in cases where they are applicable by restricting privileged communications only to those "for purposes of litigating these cases," Access Procedures § I, with requirement that any information learned from detainees involving future events that threaten national security or imminent violence be disclosed, *i.e.*, regardless of whether communications are in furtherance of such threats, *id*. § VII. A., D.-F (DoD Privilege Team permitted to disclose such information discovered in documents during classification review); *id.* § IX.C (counsel required to disclose such information).

Here, the purpose of the review of the detainee materials, including any relevant documents among them containing attorney-client communications, would be to fully uncover the complete circumstances of the suicides, including the extent to which coordination among and assistance from other detainees or others existed, as well as any other plans for additional detainee suicides or other violence. The strong public policy interests in potentially saving lives and in maintaining security and order within a wartime detention facility outweighs any limited incursion into attorney-client materials under safeguards ordered by the Court that would be involved in the Filter Team review.

The review would be seeking documents pertaining to any planned detainee suicides, past or future, as well as clues to how detainees are able to coordinate such matters among themselves and obtain documents such as the e-mail that was discovered in the initial phase of the investigation. Of course, such documents may be among documents in no way appearing or marked as attorney-client material, but relevant materials also could possibly include writings

such as the suicide notes found so far, that is, notes drafted on stationery marked with attorney-client confidentiality markings or stamps, but in no way actual attorney-client communications, much less privileged communications.  Consistent with the detainees' demonstrated creative abilities to use the attorney-client communication system contemplated by the Protective Order to attempt to shield writings that are not attorney-client communications from suspicion or scrutiny of Guantanamo personnel, other such possibilities include notes purportedly drafted to counsel but never mailed, intentionally or otherwise, or messages otherwise disguised as legal communications.  Attorney-client privilege would not apply to such materials, which are not attorney-client communications, though the status of the material as such would not necessarily be readily discernable absent translation, which would necessarily involve some review of the material.  Furthermore, such materials could very well be intermingled among legitimate attorney-client communications within a detainee's collected materials, including in envelopes in which attorney communications to detainees may be kept.  There could also be hand-written notes written on otherwise legitimate attorney-client materials.  Any applicable privilege would not apply to any such materials except to the extent that legitimate attorney-client materials in the hands of detainees serve as carrier medium for the unprivileged information.  Again, however, absent translation of the information, which necessarily involves some review of the materials, such notes are not likely to be discernable.

Thus, the primary object of the review is not aimed at legitimate attorney-client communications permitted under the Protective Order regime, but at documents relevant to the NCIS investigation.  Under the circumstances, and in light of relevant evidence so far uncovered, as well as the fact that translation will be required for many of the documents in order to ascertain the nature of the materials, the review must necessarily include review of attorney-

- 17 -

client materials. The Government anticipates that legitimate attorney-client communications under the Access Procedures not bearing on the investigation, especially those in English, can be identified quickly and set aside without detailed further review and returned to detainees. Materials in foreign languages, especially those that are not typewritten or on law firm letterhead, however, will require more detailed review to ascertain their relevancy to the NCIS investigation.

In any event, Filter Team review of materials that, when translated, ultimately appear to be attorney-client communications would not undermine or unduly impair the attorney-client privilege. The Filter Team will operate under the same type of constraints as members of the Access Procedures Privilege Team, responsible for classification review of materials intended to be kept privileged. Thus, the Filter Team members would not be involved in past or future litigation proceedings involving detainees and would operate under nondisclosure constraints ordered by the Court. No substantial question regarding fundamental litigation fairness, therefore, would arise. While the Filter Team will be familiar with the NCIS investigation, such that it can quickly and effectively determine whether any materials reviewed are relevant to the suicide-related issues being investigated and potentially not subject to privilege, it would make no disclosure of reviewed attorney-client communications without the Court's consideration and resolution of the propriety of any privilege claim.

To the extent petitioners would attempt to argue that the review of attorney-client communications by the Filter Team will undermine the privilege by chilling future communications between a detainee and his counsel, such an argument should be rejected. The current situation and need for review of detainee materials has arisen as a result of manifest abuse of the legal mail system by detainees, and possibly others, such that the purported attorney-client materials among the detainees' documents may harbor information relevant to the pending

investigation as well as information regarding plans or coordination respecting the prior suicides
or possible future suicides.  Furthermore, it is anticipated that procedures at Guantanamo that
accommodated detainees in ways that may have given them opportunities to abuse the legal mail
system – for example, permitting counsel to provide detainees with notepaper stamped with
attorney-client confidentiality markings – will be revised going forward to make it more difficult
for detainees to abuse the system.  Such reform will mitigate the need for review of detainee
attorney-client materials in the future and, thus, concerns that future legitimate attorney-client
communications would be subject to review.

       The appropriateness of the use of filter teams for review of attorney-client materials has
been recognized and sanctioned in other important contexts, also – namely, in the review of
attorney-client materials seized by law enforcement officials pursuant to search warrants.  For
example, in *United States v. Grant*, 2004 WL 1171258 (S.D.N.Y. May 25, 2004), the
government, pursuant to a warrant, seized a large number of documents from a business and
residence, including, specifically, documents concerning certain legal proceedings and
"assessments of legal liability."  *Id*. at *1.  The court considered proposals of the parties
regarding review of the attorney-client materials, which the government had segregated from the
seized documents, for responsiveness to the warrant and consideration of privilege prior to any
disclosure of the documents for possible use in a criminal proceeding.  The parties from whom
the documents were seized urged that any review should be conducted by the court or a special
master, citing the likelihood of privileged information in the materials and the alleged absence of
a showing of necessity for the government to invade the privilege.  *Id.*  The government proposed
that a "privilege team" of government attorneys not involved in the criminal matter be permitted

- 19 -

to review the documents and notify the opposing party of relevant documents that would be disclosed, so that any claim of privilege could then be raised and considered by the Court.  *Id.*

The court accepted the use of a government privilege team as the appropriate method of proceeding, noting that the procedure would permit the assertion of any claim of privilege prior to disclosure of any documents, while the alternative, an initial *ex parte* review of the documents by a judicial officer or master appealable to the court, would force the government to contest a nondisclosure ruling "[un]aided by the contents of the documents" to support any exception to application of privilege.  *Id*. at *2.  The court noted, "Although some of these documents likely contain attorney-client privileged communications, the Government should be allowed to make fully informed arguments as to the privilege if the public's strong interest in the investigation and prosecution of criminal conduct is to be adequately protected."  *Id.*  The court also was mindful that initial review of the documents by a government privilege team would reduce the burden on the court, narrow possible disputes over disclosure, and expedite the matter.  *Id.* at *3.  At bottom, the court concluded that the government's interest "outweigh[ed] the limited incursion into the attorney client privilege" that the privilege team process permitted.  *Id.*

Likewise here, there is a strong public policy interest in fully investigating the circumstances and planning of the prior suicides as well as any planning or coordination of suicides in the future.  The evidence to date indicates a manifest need for review of all of the detainee materials, including legal materials, in order to conduct a complete investigation into these matters.  The Filter Team review proposed by respondents permits the NCIS to identify and uncover relevant documents that are not attorney-client communications, while preserving any privilege claims by petitioners over actual attorney-client communications and full consideration of arguments concerning the nonapplicability of or exception to the privilege, as appropriate.

- 20 -

And all of this is undertaken with appropriate safeguards imposed by the Court regarding the

nondisclosure duties and qualifications of the Filter Team.  Furthermore, given the sheer volume

of the detainee materials to be reviewed, as well as the logistical burden of translation, the use of

the Filter Team for the document review is necessary because it will have appropriate translator

resources and the ability to make quick determinations regarding the materiality of any particular

document or information to the ongoing investigation.  The strong public policy interests in

potentially saving lives and in maintaining security and order within a wartime detention facility

outweighs any limited incursion into attorney-client materials under safeguards ordered by the

Court that would be involved in the proposed Filter Team review.[12]  Absent such review of

---

[12] Although some judges have criticized the use of filter teams in search warrant contexts, *see*, *e.g.*, *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002), those concerns appear to have centered primarily around the implementation of the "wall" between the "taint team" and the prosecution team.  The *Stewart* court was concerned, for example, that the materials seized under the warrant and to be reviewed were likely to contain privileged materials related to criminal defendants and clients unrelated to the particular criminal defendant in the case, and that it could not be guaranteed that the the "taint team" would not have any current or future involvement in criminal cases against these unrelated individuals.  *See Stewart*, 2002 WL 1300059 at *7.  Likewise the court raised the possible perception of leaks in the wall between "taint team" and prosecutors as undermining public confidence in the criminal case proceedings and of the handling of materials by non-attorney workers on the team who were not bound by the same ethical considerations that would apply to lawyer members of the "taint team." *Id*. at *7-8.  *See Grant*, 2004 WL 1171258 at *3 (noting that "exceptional set of circumstances," not applicable in *Grant*, led to the *Stewart* decision).

The unique circumstances of the situation at issue in respondents' motion warrant use of the Filter Team, however.  Here, the issue is not merely the responsiveness of documents to the terms of a search warrant, but rather relevance of materials to an ongoing security investigation at a military detention facility during a time of war; there is a significant volume of materials that must be translated and reviewed for relevancy, such that familiarity with the investigation and translation resources are needed.  Also, in contrast to the concerns expressed in *Stewart*, here, the Filter Litigation Team will operate under Court-ordered constraints of the same type as already implemented with respect to the DoD Privilege Team under the Protective Order Access Procedures, such that the Filter Team could not disclose attorney-client communications claimed to be privileged except as permitted by petitioners' counsel or ordered by the Court.

detainee materials by the Filter Team, a significant universe of information, which the evidence indicates will contain other information material to the ongoing NCIS investigation into the threat of and coordination regarding detainee suicides, will go unreviewed. This will leave detainees with opportunity to continue to use and abuse accommodations provided them, to carry out any plans affecting the security of the Guantanamo Bay facility. The Court, therefore, should permit the Filter Team's review of the detainee materials to include review of attorney-client communications within those materials.

**B.      Appointment of a Filter Litigation Team to Represent the Filter Team in Court as Needed is Warranted.**

As discussed *supra*, because the review by the Filter Team may require the Filter Team to raise disclosure of specific attorney-client communications with the Court, it is necessary that the Court also authorize a Filter Litigation Team to represent the Filter Team in such matters. The Filter Team, as composed of DoD employees, cannot appear in court on its own to represent itself, as 28 U.S.C. § 516 "reserve[s] to officers of the Department of Justice," "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested." Further, the Filter Team obviously will not be able to disclose potentially privileged information learned during its review with current litigation counsel for respondents – even for the purpose of permitting current litigation counsel to defend or represent the Filter Team. The Filter Team, therefore, should be permitted to disclose potentially privileged or protected information to a Filter Litigation Team, which would make any legal presentation regarding the application of privilege with respect to a proposed disclosure of attorney-client communications by the Filter Team, while operating under the same type of constraints on disclosure of the information as the Filter Team. Because of the Filter Litigation Team's access to potentially privileged information,

the Filter Litigation Team would be composed of Department of Justice attorneys who would be prohibited from participating in litigation on the merits of the *habeas* petitions of Guantanamo Bay detainees or other cases brought by or against the petitioners. The Government contemplates that the Filter Litigation Team will be drawn from the ranks of an United States Attorney's office to be identified; such offices are separate, both organizationally and physically, from the Department of Justice Civil Division currently responsible for serving as litigation counsel for the Government on the merits of the Guantanamo detainee *habeas* petitions. Furthermore, the proposed Order submitted herewith provides that any filings made by the Filter Litigation Team, as well as petitioners' counsel, respecting potentially privileged matters would be made under seal, marked in a conspicuous manner to ensure proper handling, and not served upon or disclosed to litigation counsel for respondents, without prejudice to the public filing of appropriately redacted versions of such filings, as agreed upon by counsel or ordered by the Court.

      **C.**     **The Court Should Order Expedited Briefing.**

Finally, the Court should order expedited briefing in this matter, requiring petitioners response within ten calendar days, *i.e.*, July 17, 2006, and respondents' reply within four (4) business days thereafter on July 21, 2006. Such expedition is warranted given the subject matter of the investigation, and the need for action on such security-related issues to proceed expeditiously.

<u>**CONCLUSION**</u>

For the foregoing reasons, respondents' motion should be granted. Proposed orders regarding the relief sought in this motion and an expedited briefing schedule are submitted herewith.

- 23 -

Dated: July 7, 2006                     Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        DOUGLAS N. LETTER
                                        Terrorism Litigation Counsel

                                            /s/ Terry M. Henry
                                        _____
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        TERRY M. HENRY
                                        JAMES J. SCHWARTZ
                                        PREEYA M. NORONHA
                                        ROBERT J. KATERBERG
                                        NICHOLAS J. PATTERSON
                                        ANDREW I. WARDEN
                                        EDWARD H. WHITE
                                        MARC A. PEREZ
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W.
                                        Washington, DC  20530
                                        Tel:  (202) 514-4107
                                        Fax:  (202) 616-8470

                                        Attorneys for Respondents