IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASIM BEN THABIT AL-KHALAQI,** ) <br> Guantánamo Bay Naval Station, ) <br> Guantánamo Bay, Cuba ) <br>     Petitioner ) <br> ) <br>     v. ) <br> ) <br> **GEORGE W. BUSH** ) <br>     President of the United States ) <br>     The White House ) <br>     1600 Pennsylvania Avenue, N.W. ) <br>     Washington, D.C. 20500; ) <br> ) <br> **DONALD RUMSFELD** ) <br>     Secretary, United States ) <br>     Department of Defense ) <br>     1000 Defense Pentagon ) <br>     Washington, D.C. 20301; ) <br> ) <br> **ARMY COL. BRICE GYURISKO** ) <br>     Army Col. Commander, Joint Detention ) <br>     Operations Group, JTF-GTMO; and ) <br> ) <br> **ARMY BRIG. GEN. JAY HOOD** ) <br>     Commander, Joint Task Force - GTMO ) <br> ) <br>     Respondents ) | Civil Case No: 05-cv-00999 <br><br> JUDGE REGGIE B. WALTON |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES**

---

    Petitioner Asim Ben Thabit Al-Khalaqi, by and through undersigned counsel, relies on the following points and authorities in support of petitioner's opposition to Respondents' Motion for Procedures Related to Review of Certain Detainee Materials ("Motion for Procedures").

# I.

## BACKGROUND

Petitioner Asim Ben Thabit Al-Khalaqi is a prisoner at Guantanamo Bay Naval Station, Guantanamo Bay, Cuba ("Guantanamo"). The United States government has detained Mr. Al-Khalaqi at Guantanamo virtually incommunicado and without meaningful access to counsel for an undisclosed length of time—at least three years but likely much longer.

On May 18, 2005, Mr. Al-Khalaqi petitioned pro se for a writ of habeas corpus. Clerk's Record ("CR") 1. On October 14, 2005, this Court appointed Federal Defenders to represent Mr. Al-Khalaqi. CR 5. Soon thereafter, counsel began a lengthy security clearance process. Despite repeated requests to expedite that process, the government only cleared counsel to communicate with Mr. Al-Khalaqi less than a month ago, in late June 2006. During the over eight months that counsel has represented Mr. Al-Khalaqi, the government has not allowed counsel to visit—or even communicate—with him. Nor has the government provided counsel with any information related to Mr. Al-Khalaqi's case, beyond the scant information provided in Mr. Al-Khalaqi's pro se habeas petition.

Although the government has not yet provided counsel with access to Mr. Al-Khalaqi or to any information whatsoever regarding the specifics of Mr. Al-Khalaqi's case, counsel has filed papers on Mr. Al-Khalaqi's behalf, including the Motion for Notice of Transfer (filed December 5, 2005), CR 10, an amended petition for a writ of habeas corpus (filed December 7, 2005) ("habeas petition" or "Petition"), CR 12, and the Motion to Issue Writ (filed December 29, 2005), CR 16.[1]

On January 11, 2006, this Court issued an order denying without prejudice all pending motions "until such time as the District of Columbia Circuit resolves the questions of this Court's

---

[1] Counsel have yet to visit with Mr. Al-Khalaqi. However, Mr. Al-Khalaqi almost certainly has prepared materials for his defense that are meant for his attorneys. It is the government's seizure and review of these materials to which this opposition is directed.

jurisdiction to adjudicate this cases" and "staying this action pending the jurisdictional ruling of the District of Columbia Circuit."  CR 21.

On May 11, 2006, in an effort to progress toward visiting and communicating with Mr. Al-Khalaqi at the earliest possible date, counsel moved for entry of the Protective Order, which the government opposed.  On June 15, 2006, after briefing from both parties, this Court granted Mr. Al-Khalaqi's motion for entry of the Protective Order.

On June 10, 2006, three detainees at Guantanamo were found dead in their cells at Guantanamo—apparently as the result of suicides.  Motion for Procedures at 3.  In response to these deaths, the Naval Criminal Investigative Service ("NCIS") "began an investigation of the circumstances of the suicides[.]"  Harris Decl. ¶ 2.

On June 29, 2006, the Supreme Court of the United States decided Hamdan v. Rumsfeld, ___ U.S. ___, 126 S. Ct. 2749 (2006).  In Hamdan, the Supreme Court determined that the Detainee Treatment Act of 2005 ("DTA") does not strip federal courts of jurisdiction over pending habeas actions involving detainees such as Mr. Al-Khalaqi.  Id. at 2769 n.15.  Specifically, the Supreme Court rejected the government's subject matter jurisdictional challenge to federal courts' authority to resolve Mr. Hamdan's habeas petition, where Mr. Hamdan challenged the Executive's authority to prosecute and punish him and the procedures that the Executive proposed to do so.  Id.; see also id. at 2759.

On July 7, 2006, Respondents filed a Notice Regarding Steps Taken in the Wake of the Supreme Court's Decision in Hamdan v. Rumsfeld ("Notice"), CR 28, asserting that this Court still lacks jurisdiction over Mr. Al-Khalaqi's habeas petition, despite the Supreme Court's decision in Hamdan.  Respondents maintain "that a stay remains appropriate" while due process issues are pending in the appeals court.  Notice at 3 n.3.

On the same day that Respondents filed the Notice maintaining that "a stay remains appropriate," they filed another document requesting judicial intervention—namely, the Motion for Procedures.  CR 27.  The Motion for Procedures makes clear that the government has impounded

"certain materials associated with . . . [Mr. Al-Khalaqi]," Motion for Procedures at 1, and searched Mr. Al-Khalaqi's cell, id. at 6, as part of the "NCIS investigation to determine the circumstances and cause of death with respect to ... recent suicides," id. at 4.

Recent accounts suggest that the government has subjected detainees such as Mr. Al-Khalaqi to even more punishing prison conditions than usual in response to the suicides.  See, e.g., Hicks says Guantanamo conditions worse after detainee suicides, Jurist Legal News & Research, July 7, 2006 (reporting that Guantanamo detainee "told family members that conditions at the detention center have worsened in the wake of three detainee suicides"), attached as Exhibit A; Calls to close Guantánamo grow after suicides, Assoc. Press, June 11, 2006 (noting that guards "now give bedsheets to detainees only when they go to bed and remove them after they wake up in the morning"), attached as Exhibit B, Guantánamo inmate tells of worsening conditions, Associated Press, July 7, 2006 (reporting that detainee""told his family that the guards at the prison had become 'very tough' since three inmates committed suicide last month, and said he thought other inmates were being punished for the deaths"), attached as Exhibit C.  According to the Associated Press, "[h]uman rights activists and defense attorneys said the deaths signaled the desperation of many of the 460 detainees held on suspicion of links to Al Qaeda and the Taliban."  Id.

On July 24, 2006, this Court ordered that Mr. Al-Khalaqi file any opposition to the Motion for Procedures by August 4, 2006.  Respondents have until August 11, 2006 to file a reply.

This opposition follows.

**II.**

**THIS COURT SHOULD DENY RESPONDENTS' MOTION FOR PROCEDURES AND SAFEGUARD MR. AL-KHALAQI'S RIGHT TO ENGAGE IN ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS**

Nearly a month after the fact, Respondents now disclose to this Court that, between June 10 and June 14, 2006, NCIS seized and examined over a half-ton of written communications between Guantanamo prisoners and their lawyers.  Kisthardt Decl. ¶¶ 2-5.  The government's seizure and

examination of these materials violates the Protective Order entered in this case and well-settled principles of American and international law. Nevertheless, having belatedly disclosed its illegal seizure and examination of privileged materials, the government now asks this Court to condone its actions and permit it to retain the seized materials and examine them even more closely. Not only should this Court summarily deny Respondents' request, this Court should find Respondents in contempt, sanction the government for its illegal conduct, and refer the matter to the Justice Department's Office of Professional Responsibility, as urged by the American Bar Association ("ABA"). See Letter from Michael S. Greco of the ABA to Arlen Specter and Patrick Leahy, attached as Exhibit D (urging "the [U.S. Senate Committee on the Judiciary] to request that the Inspectors General for the Department of Defense and the Justice Department investigate this matter promptly and make their findings and conclusions public in a report to the Committee).

A.   **The Attorney-Client Privilege Applies.**

It is now settled that prisoners held at Guantanamo, including Mr. Al-Khalaqi, have a right to representation and access to counsel. In 2004, the Supreme Court rejected the proposition of Guantanamo as a legal black hole. Rasul v. Bush, 542 U.S. 466, 485 (2004). In that same year, the Supreme Court held that a United States-citizen detainee alleged to be an enemy combatant and seeking access to counsel to challenge that classification "unquestionably has the right to access to counsel in connection with ... [habeas corpus] proceedings[.]" Hamdi v. Rumsfeld, 542 U.S. 507, 539 (2004).

In response to these cases, judges of this Court have reached the inevitable conclusion that the right to counsel encompasses and includes the right to freely and safely communicate with counsel in a privileged manner. In Al Odah v. United States, 346 F. Supp. 2d 1, 10 (D.D.C. 2004), Judge Kollar-Kotelly of this Court recognized that "[t]he privilege that attaches to communication between counsel and client has long held an exceptional place in the legal systems of the United States." Magistrate Judge Kay of this Court "flatly rejected" the government's position that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to

be imposed as it saw fit" and the government's effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees." Adem v. Bush, 425 F. Supp. 2d 7, 11-12 (D.D.C. 2006).

The Protective Order entered in this case reflects these principles. The Protective Order contains mechanisms carefully tailored to safeguard the attorney-client privilege while ensuring security at Guantanamo. By establishing a Privilege Team comprised of government attorneys and other personnel who have not, and will not, take part in proceedings involving the detainees, the Protective Order deliberately shields attorney-client communications from Respondents' review. See Protective Order ex. A, § II.D. Furthermore, the Protective Order tightly circumscribes even the Privilege Team's involvement in attorney-client communications. The Privilege Team reviews "letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation"—for physical contraband not content—and then seals them for delivery to Guantanamo. Id. at §§ II.E, IV.A.3. The Protective Order prohibits Guantanamo personnel from opening incoming legal mail. Id. at § IV.A.4.

Were there any doubt that Guantanamo detainees such as Mr. Al-Khalaqi are entitled to the protections the Protective Order affords, including effective access to counsel, in Hamdan, the Supreme Court made clear that at least Article 3 of the Geneva Conventions applies to Mr. Al-Khalaqi, including the provision prohibiting "[t]he passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." See Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3318, T.I.A.S. No. 3364, Article 3; Hamdan 126 S. Ct. at 2795. The "civilized peoples" of the United States, at least, afford the judicial guarantee of access to counsel to detainees, including

the protections of the attorney-client privilege.[2]  The Protective Order only implements this longstanding guarantee.

In short, the Protective Order, the above-cited cases, and international law vindicating access to counsel for detainees such as Mr. Al-Khalaqi confirm what should now be clear.  The attorney-client privilege is the meat on the bones of the effective representation to which Mr. Al-Khalaqi is entitled.  See, e.g., Back v. Illinois, 504 F.2d 1100, 1102 (7th Cir. 1974) ("An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to regress his grievances is particularly important"); Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir.

---

[2] It should not be overlooked that, while the focus of Hamdan is Article 3 of the Geneva Conventions, there are numerous references to and assumptions that the other articles may apply as well—and the President has conceded as much.  As noted in Hamdan, "[t]he President has stated that the conflict with the Taliban is a conflict to which the Geneva Conventions apply." 126 S. Ct. at 2795, n.60 (citing White House Memorandum, Humane Treatment of Taliban and al Quaeda Detainees 2 (Feb. 7, 2002), attached as Exhibit E.  See also 126 S. Ct. at 2793 (rejecting court of appeals' conclusion that Hamdan is not entitled to the protections—plural not singular—of the Geneva Conventions without limiting such protections to only Article 3); id. at 2795, n.61 (discussing Hamdan's contention that Article 5 of the Geneva Conventions confers prisoner-of-war status upon him and deciding it does not—not because Article 5 does not apply or because only Article 3 applies, but, rather because the military tribunal convened to try Hamdan was illegitimate whether or not he was a "prisoner of war"); but see id. at 2795 (not reaching the question of whether the Geneva Conventions in their totality apply, because, at a minimum, Article 3 applies).

This is important because both the Geneva Conventions and the Uniform Code of Military Justice ("UCMJ") relied on by the Supreme Court in Hamdan as a lodestar for the minimum protections available to a Guantanamo detainee charged with a crime provide for a right to counsel.  See Geneva Convention (III) Relative to the Treatment of Prisoners of War ("GPW"), Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3318, T.I.A.S. No. 3364, Article 98 ("No prisoner of war may be convicted without having had an opportunity to present his defence and the assistance of a qualified advocate or counsel"); id. at Article 105 ("The prisoner of war shall be entitled to . . . defence by a qualified advocate or counsel of his own choice . . . "); id. at Article 3 (prohibiting "[t]he passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples"); 10 U.S.C. § 838(b)(1) ("The accused has the right to be represented in his defense before a special or general court-martial . . . .").  The Geneva Conventions also provides that counsel for the prisoner of war "may, in particular, freely visit the accused and interview him in private."  GPW, Article 105.

1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").  See also Procunier v. Martinez, 416 U.S. 396, 419 (1974) (holding that, even for prisoners convicted of *crimes*, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid").  The issue, then, is not whether Mr. Al-Khalaqi is protected by the attorney-client privilege, but instead, whether the government's violation of the privilege was justified.  It was not.

**B.    The Government's Violation of the Attorney-Client Privilege Was Unwarranted.**

Before the government can abrogate the attorney-client privilege, it must make a specific, individualized showing that there is a sufficiently compelling justification for invading the privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies—that is, that the client whose privilege the government seeks to breach "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.  In re Sealed Case, 107 F.3d 46, 49 (D.C. Cir. 1997).[3]

Seizure of legal papers is a particularly egregious violation of the attorney-client privilege because it strikes at the heart of the attorney-client relationship and interferes with a detainee's access to the courts.  See, e.g., Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) ("The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts . . . .  [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and

---

[3]  See also In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that the attorney-client communications were used to further that crime or fraud); In re Grand Jury Subpoena Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents that the corporation failed to produce).

can only be justified if it is reasonably related to a legitimate penological interest" (internal citations omitted)).[4] Thus, even when seized documents will be reviewed in camera by the court—and not by the government, as proposed here—"the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that . . . *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." United States v. Zolin, 491 U.S. 554, 572 (1989) (internal quotations and citations omitted). In this case, the government has made no showing whatsoever "of a factual basis adequate to support a good faith belief by a reasonable person" that Mr. Al-Khalaqi has misused his legal papers. Id. In fact, the government has made no factual showing with respect to Mr. Al-Khalaqi at all.

As the basis for its wholesale seizure of over a half-ton of privileged materials from hundreds of prisoners, the government claims that it seized the prisoners' legal papers because notes found in the cells of the prisoners that allegedly committed suicide suggested that the prisoners might have used the cloak of the attorney-client privilege to further a suicide plot by the prisoners, perhaps "encouraged, ordered, or assisted by third parties." Harris Decl. ¶ 4. In particular, "NCIS found what appeared to be handwritten suicide notes on the deceased detainees persons." Id. ¶ 3. Additionally, NCIS "discovered a handwritten note hidden in the mesh wall of one of the deceased detainee's [sic] cell which, when translated, was found to be related to the suicides." Id. The back of the note was stamped "Attorney Client Privilege." Id. In other prisoners' cells, the NCIS found additional "notes . . . considered to be relevant to the investigation . . . , many of them on stationery stamped 'Attorney-Client Communication,' 'Privileged and Confidential,' and 'Attorney-Detainee

---

[4] See also Simmons v. Dickhaut, 804 F.2d 182, 183-84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); Carter v. Hutto, 781 F.2d 1028, 1031-32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); Hiney v. Wilson, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

Materials[.]'" Id. After expanding the scope of its search "to include handwritten materials in all enemy combatant detainees' cells throughout the Guantanamo detention facility," id. ¶ 4, NCIS found a note containing "instructions on tying knots, id. ¶ 5, "an original JTF-GTMO generated email that appeared to contain classified or sensitive information regarding cell locations of detainees as well as details concerning camp operational matters," id., and envelopes marked as privileged containing a document "with a 'Secret' stamp lined out and marked 'Unclassified,' id., and a document stamped "FOUO," id..

These vague allusions to "evidence" completely unrelated to Mr. Al-Khalaqi do not establish a "legitimate penological interest" in seizing Mr. Al-Khalaqi's legal documents. Not only does seizing Mr. Al-Khalaqi's papers interfere with his access to the courts, it chills the giving, receiving, and continued possession of communications from Mr. Al-Khalaqi to his attorneys. To burden Mr. Al-Khalaqi's access to the courts and counsel in this manner, the government must prove more.

In any event, the government's own descriptions of the documents seized offer little support for the government's position that attorney-client materials are being misused, let alone specific evidence that Mr. Al-Khalaqi has misused such materials. In fact, the government's description of the documents indicates that many of the documents were documents that the prisoners legitimately could possess, not contraband. For example, the government alleges that one of the documents was labeled "FOUO" ("For Official Use Only"). As the government well knows, "FOUO" stamps are not classification designations. "FOUO" is simply an internal Department of Defense designation used to designate whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ." Department of Defense Reg. 5200.1: C5.2.7.1.1.3 (emphasis added). The designation specifically is "not authorized as an anemic form of classification to protect national security interests," id. 5400.7-R:C4.1.1, and in fact "is, by definition, unclassified," id. AP3.2.2.3.2. Thus, there is nothing illegitimate about a prisoner's possessing a document with a FOUO designation.

Similarly, the government's allegation that a prisoner's possession of a document with a crossed-out "SECRET" stamp, marked "Unclassified," is suspect rings hollow. There is nothing to suggest that a document marked in this manner is a classified document.[1] It is more likely that this is a document that was *once* classified, but then was declassified and marked accordingly. Because the Protective Order does not prevent prisoners at Guantanamo from possessing unclassified documents, there is nothing illegitimate about a prisoner's possessing a document with a crossed-out "SECRET" stamp.

The remainder of the documents that the government references similarly do not support the breach of attorney-privilege that the government proposes—and has already engaged in—here. For example, the government does not allege that the so-called "knot-tying" document was labeled "attorney-client material"; nor does the government allege that this document was discovered in a prisoner's privileged legal folder. Thus, this document provides no support for the government's reviewing privileged materials. Similarly, the prisoners do not appear to have been hiding the alleged suicide note handwritten on the back of a piece of paper marked "attorney-client privileged." The government apparently discovered this paper in the mesh of one of the dead prisoners' cells, not secreted in a privilege folder. If the deceased prisoner was seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document, why did he place it where guards would inevitably discover it? It is more likely that the prisoner wanted the note to be discovered, and that he drafted it on the only piece of paper readily available to him—a piece of paper that happened to be marked "attorney-client privileged."

---

[1] Because the government has not provided counsel with copies of the documents it relies upon for the instant motion, counsel can only make an educated guess about the nature of the formerly "SECRET" document.

The government does alert counsel and the Court to a single document that (from the government's description of it, anyway) perhaps should not have been in a prisoner's possession. Remarkably, however, the document is an email from the Joint Task Force at Guantanamo—a document that counsel did not provide to the prisoner, because counsel do not have access to such documents. How did this document come into possession of a prisoner? Did an interrogator or guard provide it? The NCIS should be investigating Joint Task Force personnel, not ransacking Mr. Al-Khalaqi's legal papers.

Finally, the very premise of the government's inquiry—that the detainees are passing papers between themselves in order to communicate—is fundamentally flawed. The government alleges that it must seize and review Mr. Al-Khalaqi's documents to investigate "whether a coordinated plan existed for the suicides involving encouragement, assistance or direction of other detainees or individuals, as well as the existence of any other plots or plans for additional detainee suicides." Motion for Procedures at 8, 13, 15. However, the government never explains why the detainees would have the need to engage in elaborate and secret schemes to communicate via notes and papers, given that the detainees likely live, recreate, and eat together. Furthermore, many of the detainees share common languages that the guards do not speak. If the detainees were plotting crimes, as the government alleges, common sense suggests that they would plot orally, out of the guards' earshot, not on papers sure to be found.

In short, the government has made no showing that the seizure of Mr. Al-Khalaqi's effects was warranted, let alone the individualized showing that the law requires. The government's thin and ephemeral "evidence" of wrongdoing simply cannot support the seizures that occurred here, let alone further intrusion into privileged attorney-client communications.

C.     **This Court Should Not Authorize a Defense Department "Filter Team" to Read the Seized Attorney-Client Materials.**

In the unlikely event the government can make an adequate showing "'of a factual basis adequate to support a good faith belief by a reasonable person' . . . that *in camera* review of the materials [seized from Mr. Al-Khalaqi] may reveal evidence to establish" that they are linked to the suicides or that an exception to the privilege applies, Zolin, 491 U.S. at 572, the government's proposed "taint" or "filter" team is untenable.  If this Court determines that further review of the seized materials is warranted, that review should be conducted only by the Court or a person appointed by the Court—not by the government's "filter team."  See, e.g., United States v. Neill, 952 F. Supp. 834, 841 & n.14 (D.D.C. 1997) (criticizing use of taint team as "unwise," because it "constitutes a *per se* intentional intrusion" on privilege and "at the very least . . . create[s] an appearance of unfairness").

The government suggests a proposed procedure by which a "filter team" comprised of military personnel would review materials, and then forward them to a "filter litigation team" consisting of federal prosecutors.  Motion for Procedures at 10-11, 22-23.  In the government's view, this is a "fair" process of determining whether it can find useful needles of evidence concerning suicide plots in the 1,100 pound haystack of papers that it indiscriminately has confiscated from the Guantanamo detainees.  Not only does this proposed procedure needlessly trample on Mr. Al-Khalaqi's right to keep privileged materials out of his captors' hands, the proposed procedure also "create[s] an appearance of unfairness" that threatens to undermine Mr. Al-Khalaqi's relationship with his attorneys.  United States v. Neill, 952 F. Supp. 834, 841 & n.14 (D.D.C. 1997).

It cannot be overlooked that Mr. Al-Khalaqi has been detained virtually incommunicado for more than three years. During that time, the government has not charged Mr. Al-Khalaqi with a crime. Nor has the government afforded Mr. Al-Khalaqi the opportunity to meet with his court-appointed counsel who were only recently given the security clearances necessary to visit Mr. Al-Khalaqi. Thus, Mr. Al-Khalaqi's only interactions have been with interrogators and prison guards—his captors. Under the government's proposed plan, Mr. Al-Khalaqi's captors now would retain sensitive documents they unilaterally seized from him, rather than deposit them with a neutral party. The appearance of impropriety cannot be lost on Mr. Al-Khalaqi.

Nor should the ramifications of Mr. Al-Khalaqi's perceptions be lost on this Court. Many detainees already suspect that their civilian attorneys are simply government agents in disguise as a result of statements made to them by interrogators and other government personnel. See, e.g., Charlie Savage, Guantanamo Detainees Find Fault with Lawyers, Boston Globe, Aug. 10, 2005, at A1, attached as Ex. F. Absent this Court's affirming the sanctity of the attorney-client privilege, these seizures will only make Mr. Al-Khalaqi's trust that much harder for counsel to win, further impeding Mr. Al-Khalaqi's access to counsel.

Even the government cannot avoid the fact that courts are reluctant to entrust attorney-client privileged materials teams of government actors like the "filter team" proposed here. See Motion for Procedures at 21 n.12. See, e.g., Black v. United States, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); United States v. Abbell, 914 F. Supp. 519, 520-21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged

documents obtained by search warrant). In fact, less than three weeks ago, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege." In re Grand Jury Subpoenas, __ F.3d __, 2006 WL 1915386 (6th Cir. July 13, 2006).

Even more recently, last Friday, the District of Columbia Circuit granted an emergency motion to stay the very sort of "filter team" review proposed by the government in this case. In United States v. Rayburn Office Bldg, Rm. 2113, No. 06-3105 (D.C. Cir. July 28, 2006), attached as Ex. G, the D.C. Circuit enjoined the government from reviewing documents seized from a congressman's office pursuant to a search warrant and ordered that the congressman himself be allowed to review the seized documents to determine if any of the documents were privileged. Id. Potentially privileged documents would be reviewed in camera by the district court, not by the proposed "filter team." Id. In that case, unlike this one, the government seized documents pursuant to a search warrant supported by probable cause. Nonetheless, the appellate court crafted a review procedure sensitive to the congressman's privilege, rather than giving the government license to determine the nature, scope, and legitimacy of the intrusion. This case demands at least a similar level of caution, if not much more.

The government likely will argue that the task of sorting through the seized material is a mammoth task that this Court is ill-equipped to perform. It will lament the volume of material seized—1,100 pounds—and the number of languages that must be translated. It will lament the delay that would be caused by adopting Mr. Al-Khalaqi's proposal that the Court appoint an impartial party to review the materials, and it will assert the urgency with which this review must

occur. It should not be lost on the Court, however, that the government created its own delay. The government waited almost a month to file its motions. More importantly, the primary reason any review—be it by an impartial party appointed by this Court, or a "filter team"—will be lengthy is because of the indiscriminate means by which the government collected its 1,100 pounds of "evidence." Mr. Al-Khalaqi should not be made to further suffer the consequences of the government's negligent procedures.

Finally, to the extent that the government seeks support for its position in United States v. Grant, 2004 WL 1171258 (S.D.N.Y. May 25, 2004), its reliance is misplaced. In Grant, a large number of documents, including some potentially privileged materials, were lawfully seized on the basis of probable cause and a valid search warrant. In other words, the government had already determined (with the court's imprimatur) that all the materials authorized to be seized, including the privileged materials, were connected with some degree of certainty to criminal conduct. Here, on the other hand, documents were indiscriminately impounded. Thus, no such prior determination—much less the confirmation of a prior determination by a neutral arbiter—has been made. Moreover, the Grant court only permitted the government "privilege team" to do an initial review of the seized materials because defendants were guaranteed the opportunity to object to the use of any document before it was turned over to the government trial team. Id. at *2. In contrast, the government's proposal in the instant case does not assure Mr. Al-Khalaqi's counsel that essential right. Under the government's proposal, Mr. Al-Khalaqi's counsel could be bypassed altogether—even in regard to the review of privileged materials directed to counsel.

16

In short, the procedures the government proposes are unprecedented and unsupportable. Under these troubling circumstances, this Court should dismiss the government's proposal and create—if anything—a review procedure that maintains the appearance of fairness, while intruding as little as possible on Mr. Al-Khalaqi's relationship and communications with his attorneys.

**D.     The Court Should Sanction the Government's Unlawful Conduct And, as an Interim Measure, Order it to Deposit the Seized Attorney-Client Materials With the Court**

The Court should not allow NCIS's confiscation and possible reading of Mr. Al-Khalaqi's privileged materials to go unpunished. The government does not claim that there was any emergency or imminent threat of the materials' destruction necessitating NCIS's unilateral actions, taken without notice to—let alone permission from—this Court. NCIS's actions were deliberate, calculated, and in flat violation of this Court's Protective Order. Not only did the government violate this Court's orders, it waited a month to inform the Court and counsel regarding its actions. Under these circumstances, the Court should impose sanctions against the government for its irresponsible and unlawful conduct. In addition, the Court should act to mitigate the harm NCIS's unlawful actions have inflicted by ordering the government to immediately deposit the seized materials with the Court pending the materials' ultimate return to Mr. Al-Khalaqi.

## VI.

## **CONCLUSION**

For the above-stated reasons, and for any other reason that may become known to this Court, Mr. Al-Khalaqi respectfully requests that this Court deny the government's Motion for Procedures.

Dated:  August 4, 2006                                     Respectfully submitted,


/s/ Ellis M. Johnston, III
/s/ Heather R. Rogers
/s/ Reuben Camper Cahn
Ellis M. Johnston, III (Cal. Bar No. 223664)
Heather R. Rogers (Cal. Bar No. 229519)
Reuben Camper Cahn (Florida Bar No. 874299)
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467

Counsel for Petitioner