IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
**ASIM BEN THABIT AL-KHALAQI,**                             )
Guantánamo Bay Naval Station,                               )
Guantánamo Bay, Cuba                                        )        CIVIL ACTION
          Petitioner )
                                                            )
    v.                                    )
                                                            )        No: 05-cv-00999
**GEORGE W. BUSH**                                          )
    President of the United States        )
    The White House                       )        JUDGE REGGIE B. WALTON
    1600 Pennsylvania Avenue, N.W.        )
    Washington, D.C. 20500;               )
                                                            )
**ROBERT M. GATES**                                         )
    Secretary, United States              )        **RESPONSE IN OPPOSITION**
    Department of Defense                 )        **TO RESPONDENTS'**
    1000 Defense Pentagon                 )        **MOTION TO DISMISS**
    Washington, D.C. 20301;               )
                                                            )
**ARMY COL. BRICE GYURISKO**                                )
    Army Col. Commander, Joint Detention  )
    Operations Group, JTF-GTMO; and       )
                                                            )
**ARMY BRIG. GEN. JAY HOOD**                                )
    Commander, Joint Task Force - GTMO    )
                                                            )
          Respondents )
_____)

## INTRODUCTION

     Petitioner Asim Ben Thabit Al-Khalaqi opposes the government's Motion to Dismiss

because (1) the  Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA"),

and Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA"), MCA

have not stripped this Court of jurisdiction, contrary to the ruling in *Boumediene v. Bush*, 476

1

F.3d 981 (D.C. Cir. 2007) ("*Boumediene I*"); and (2) even if this Court finds that it is bound by the jurisdictional ruling in *Boumediene I*, controlling Circuit and Supreme Court authority require the Court to continue the stay of the District Court proceedings, holding them in abeyance pending the petitioner's exhaustion of remedies under the DTA.

## I.

### THE DTA AND MCA HAVE NOT STRIPPED THIS COURT'S JURISDICTION[1]

**A.     Respondents' Construction Of The DTA and the MCA Would Violate The Constitution's Prohibition Against Bills Of Attainder.**

The DTA and MCA amendments to § 2241, customized to deny habeas and other court access to a small, distinct, and unpopular group, is a classic Bill of Attainder prohibited by Article I, § 9, clause 3, of the Constitution ("No Bill of Attainder . . . shall be passed."). It is precisely this type of "deprivation of any rights, civil or political," including "the privilege of appearing in the courts," especially when imposed on a disfavored minority, that has been condemned by the Supreme Court. *Cummings v. Missouri*, 71 U.S. 277, 320 (1866); *accord United States v. Brown*, 381 U.S. 437, 445-47 (1965).

To qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment. *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The element of specificity is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946).

The target group of the DTA and MCA is any "alien detained by the Department of Defense at Guantánamo Bay, Cuba." DTA, § 1005(e)(1). These individuals could not be more discretely identified: the only persons detained at the detention camp are those whom the Executive Branch

---

[1] Petitioner acknowledges that the Court of Appeals has ruled to the contrary in *Boumediene I*. Petitioner respectfully submits that the Court's ruling is wrong, contradicts Supreme Court authority, and eventually will be overturned. These issues, therefore, are included to preserve the record for appeal.

puts there.  The individuals to whom the legislation applies are the named persons who have

petitioned for habeas relief, the as yet unnamed John Doe detainees at Guantánamo Bay, and any

others held at the Guantánamo Bay prison camp.  The DTA and MCA easily meet the specificity

criterion for classification as a Bill of Attainder.

The Acts also easily meet the punishment requirement for a Bill of Attainder.  From the time

of Chief Justice Marshall, the scope of forbidden punishment falling within the attainder prohibition

has included banishment, deprivation of the right to vote, corruption of blood, and confiscation of

property.  *Foretich*, 351 F.3d at 1217.  Following the Civil War, Congress and the States enacted

legislation aimed at persons who had rebelled against the United States, barring practice of certain

professions without an expurgatory oath of loyalty.  In *Cummings v. Missouri*, 71 U.S. 277 (1866),

the Court freed a priest who ministered without swearing the oath, stating:

> The deprivation of any rights, civil or political, previously enjoyed, may be
> punishment, the circumstances attending and the causes of the deprivation
> determining this fact. Disqualification from office may be punishment, as in
> cases of conviction upon impeachment. Disqualification from the pursuits of
> a lawful avocation, or from positions of trust, or from the privilege of
> appearing in the courts, or acting as an executor, administrator, or guardian,
> may also, and often has been, imposed as punishment.

71 U.S. at 320 (emphasis added).  Similarly, in *Ex parte Garland*, 71 U.S. 333 (1866), loyalty oath

legislation that barred an attorney from the courtroom was held to constitute a Bill of Attainder:

> As the oath prescribed cannot be taken by these parties, the act, as against
> them, operates as a legislative decree of perpetual exclusion. And exclusion
> from any of the professions or any of the ordinary avocations of life for past
> conduct can be regarded in no other light than as punishment for such
> conduct.

71 U.S. at 377.  The Civil War cases make clear that Congress cannot legislate to the detriment of

a group—irrespective of size—that is defined by the status of its members so as to permanently

exclude them, on the basis of that status, from civil liberties ordinarily enjoyed by all.[2]

---

[2]  In *Brown*, the Supreme Court found that the Bill of Attainder prohibition stemmed from
separation of powers concerns:

> [T]he Bill of Attainder Clause not only was intended as one implementation

Determination of the punitive aspect of legislation barred by the Bill of Attainder Clause analysis has included consideration of three factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Foretich*, 351 F.3d at 1218 (quoting *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 852 (1984)). A statute need not satisfy all three factors to be a Bill of Attainder; they are merely factors to be considered. *Id*. at 852. "Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services*, 433 U.S. 425, 475 (1977). The test is functional rather than dependent upon legislative labeling. *Cummings*, 71 U.S. at 325 ("The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.").

Denial of equal access to the courts meets the historic definition of punishment. If exclusion from vocations constitutes punishment—including "appearing in the courts" as in *Cummings*—then barring a prisoner from bringing a claim for habeas relief before the district court can only be a punitive measure. This is especially true because the DTA and MCA's exclusion cripples the ability of Guantánamo detainees to attack the constitutional legitimacy of their confinement and destroys any opportunity they might otherwise have had in habeas litigation to develop facts to counter the one-sided record created in the Combatant Status Review Tribunal (CSRT). Consequently, as construed by Respondents, the DTA and MCA ensure that Petitioner's detention will be prolonged

_____

of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness, of, and levying appropriate punishments upon, specific persons.

*Brown*, 381 U.S. at 445.

4

and indefinite, a state of affairs which the Cummings Court—citing to Blackstone—listed as an historically-recognized form of punishment. 71 U.S. at 321 (quoting William Blackstone, 4 COMMENTARIES OF THE LAWS OF ENGLAND *377 (1769)). *See also Lynce v. Mathis*, 519 U.S. 433, 442 (1997) (discussing constitutional bases for the prohibitions on retroactive legislative action and removal of eligibility for a benefit as punishment).

The punitive aspects of the DTA and MCA, as a practical matter, are extreme. Imprisonment itself is punitive—whether brief or prolonged and regardless of the conditions. *Brown*, 381 U.S. at 458 (imprisonment regardless of its purpose is punishment). Here, Petitioner has been in onerous custody, virtually incommunicado, for more than five years. Given the length of custody and suffering Petitioner has endured, the continued indefinite detention is at the apex of punitive treatment. *Zadvydas* v. Davis, 533 U.S. 678, 690 (2001).

The punitive reality of the new legislation accords with the animus toward the detainees that has been expressed by some members of both the Legislative and Executive branches. The detainees have been repeatedly pre-judged and characterized as "terrorists." This animus is especially anomalous in light of indications from the declassified CSRT proceedings that only a minority of detainees are alleged to have taken up arms against the United States, and very few belong to al Qaeda. *See* Mark Denbeaux, Report on Guantánamo Detainees: A Profile of 517 Detainees Through Analysis of Dept. of Defense Data, Seton Hall University of Law, Feb. 2006, *available at* http://law.shu.edu/news/ guantanamo_report_final_2_08_06.pdf.

Historically, members of political groups believed to present a threat to national security have been the "targets of the overwhelming majority of English and early American bills of attainder." *Brown*, 381 U.S. at 453; *see Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137-38 (1810) ("[I]t is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed."). Politically-

suspect groups are most likely to draw the fire of legislative censure and condemnation. For a statute to be declared a Bill of Attainder, all that is necessary "is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure and condemn." *Foretich*, 351 F.3d at 1226. That is what has happened with the DTA and the MCA.

The nonpunitive purposes of the Acts are negligible compared to the punitive consequences. The statutory text of the DTA lacks any formal statement of purpose or findings regarding § 1005. The Guantánamo Bay detainee litigation raises critical questions which address the very heart of our Constitution's meaning in the real world. The protective order and its enforcement mechanisms have addressed the needs of national security sufficiently to allow the claims of Petitioner to be heard.

**B.    Respondents' Construction Of The DTA and the MCA Constitute An Unconstitutional Suspension Of The Writ Of Habeas Corpus.**

The *Hamdan* opinion directly addressed concerns that the DTA resulted in an unconstitutional suspension of the writ of habeas corpus. *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2769 (2006). The writ of habeas corpus, "[a]t its historical core, . . . has served as a means of reviewing the legality of Executive detention, and it is in that context that the protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Permanent denial of access to the writ of habeas corpus for the Guantánamo Bay detainees is unprecedented and would constitute a suspension of the writ.

Even if the DTA and MCA were construed to abrogate jurisdiction under 28 U.S.C. § 2241, review would remain available in the district courts under the common law writ of habeas corpus. In *Rasul* and *Hamdan*, the Court engaged in lengthy discussions of *Johnson v. Eisentrager*, 339 U.S. 763 (1950). *Rasul*, 542 U.S. at 475-80. In *Eisentrage*r, the six factors that militated against a right to the writ related "only to the question of the prisoners' constitutional entitlement to habeas corpus." *Rasul*, 542 U.S. at 476. The Supreme Court observed that the Court of Appeals in *Eisentrager* had found a constitutional right to the writ protected by the Suspension Clause. 542 U.S. at 477. "In essence, the Court of Appeals concluded that the habeas statute ... had created an unconstitutional

6

gap that had to be filled by reference to 'fundamentals.'" 542 U.S. at 478.

Nowhere in the Supreme Court's discussion is there any indication that a "fundamental" non-statutory (*i.e.* constitutional) right to petition for habeas relief does not exist. The Supreme Court noted the constitutional basis for seeking habeas relief in *St. Cyr*:

> In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus.

533 U.S. at 304-05. The Court expressly rejected the government's position that habeas can be eliminated by statute: "[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise." *St. Cyr*, 533 U.S. at 305; *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 96 (1868) ("It would have been, indeed, a remarkable anomaly if this court, ordained by the Constitution for the exercise, in the United States, of the most important powers in civil cases of all the highest courts of England, had been denied, under a constitution which absolutely prohibits the suspension of the writ, except under extraordinary exigencies, that power in cases of alleged unlawful restraint, which the Habeas Corpus Act of Charles II expressly declares those courts to possess.").

The inherent power of the judiciary under Article III, the common law history of the writ imported into the Constitution in the Suspension Clause, and the checks on judiciary power given to Congress in Article I, provide a sound basis for recognition of a right to habeas review that cannot be nullified by the legislature. *See* Christopher A. Chrisman, Article III Goes to War: A Case for a Separate Federal Circuit for Enemy Combatant Cases, 21 JOURNAL OF LAW AND POLITICS 31 (Winter 2005).

**C.    Respondents' Construction Of The DTA and MCA Violates The Due Process Clause Of The Fifth Amendment.**

The Due Process Clause of the Fifth Amendment provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law."  This clause includes both procedural and substantive protections and requires equal protection of the laws.  The government's interpretation of the DTA runs afoul of these concepts.

1.    *Legislation Based On Alienage Violates Petitioner's Right To Equal Protection Of The Laws.*

The Fifth Amendment's guarantee of due process incorporates the Fourteenth Amendment's equal protection clause. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954).  Although the government retains the power to classify, particularly in the area of economics and social welfare, classifications "based on alienage . . . are . . . subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).  In *Rasul*, the Supreme Court found that § 2241 applied equally to United States citizens and to aliens held at Guantánamo Bay: "Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship." 542 U.S. at 481.

The DTA, by its plain terms, strips aliens detained at Guantánamo of access to the courts, while maintaining the rights of United States citizens to such access (". . . an application for a writ of habeas corpus filed by or on behalf of an  *alien* . . . or . . . any other action . . . relating to any aspect of the detention of an *alien*. . . .").  Section 1005(e)(1) (emphasis added).  The DTA's new statutory distinction based on alienage, regardless of legal status, violates the guarantee of equal protection under law.

The restriction on access to the courts based on national origin requires strict scrutiny for two reasons.  First, discrimination based on alienage is inherently suspect.  Disparate treatment of persons based on their alienage, without respect to legal status, is generally prohibited as a classification based on national origin. *Plyler v. Doe* , 457 U.S. 202, 214 (1982) (Fourteenth

8

Amendment's phrase "person within its jurisdiction" "sought expressly to ensure that the equal protection of the laws was provided to the alien population."); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. . . . [Its] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."). By limiting the habeas-stripping provisions to aliens, the DTA recognized the District of Columbia district court's continued § 2241 jurisdiction over United States citizens at Guantánamo Bay.

Second, discrimination regarding a fundamental right, such as access to the courts, triggers heightened protections. *Tennessee v. Lane*, 541 U.S. 509, 529 (2004) (right of access to the courts "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications"); *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance."). Strict scrutiny is also required because the target group of aliens is de facto Muslim, which implicates equal protection as well as First Amendment concerns. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993). Constitutional and statutory prohibitions on arbitrary detention and torture mean little without a judicial remedy, especially where a suspect class is the target.

Congressional hostility toward the Guantánamo detainees and prejudgment of the merits of their claims does not provide a rational basis for discrimination against them. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).

9

2.      *Indefinite Detention And Unredressable Torture Violate Substantive Due Process.*

In considering the constitutionality of the authorization for detention contained in 8 U.S.C. § 1231(a)(6) (1994), the Supreme Court stated in *Zadvydas*:

> A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects.

533 U.S. at 690. The Court ultimately resolved the case by interpreting the statute to forbid indefinite detention. Identical concerns arising out of the substantive liberty component of the Due Process Clause apply here. Should the Court accept Respondents' interpretation of the statute, it would be required to address the due process question raised, but avoided, in *Zadvydas* and *Martinez.*

The substantive due process issues are even more acute here because of the Guantánamo detainees' claims of torture and mistreatment. Respondents make the Orwellian claim that the DTA bars torture while at the same time depriving torture victims of meaningful access to the courts. The moral identity of our Republic, as well as its prestige abroad, is compromised by this position, which implicates substantive due process. *Rochin v. California*, 342 U.S. 165, 167-73 (1952).

3.      *The DTA and MCA's Limitations On Judicial Review Violate Procedural Due Process.*

The DTA and the MCA offer no other substantive procedural protections than those found to be constitutionally inadequate by the district court in *In re Guantánamo Detainee Cases*, 355 F. Supp. 2d 443, 468 (D.D.C. 2005). In reliance on *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the district court found that the failure of the CSRT process not only to provide detainees access to the material evidence upon which the CSRT affirmed "enemy combatant" status but also to permit the assistance of counsel were general procedural defects rendering the proceedings unconstitutional. *See In re Guantánamo Detainee Cases*, 355 F. Supp. 2d at 465-72. In *Hamdan*, the Supreme Court

10

emphasized the need for procedural regularity in military proceedings involving loss of liberty. 126 S. Ct. at 2786-98. The published transcripts of 360 CSRT and ARB proceedings illustrate the systemic inadequacies of the process.

The District Court has also found that reliance on coerced statements and a vague and overly broad definition of "enemy combatant" were specific defects of the process. *See In re Guantánamo Detainee Cases*, 355 F. Supp. 2d at 473. With the exception for use of coerced evidence, the DTA does not address, much less overcome, these deficiencies. The only "improvement" in the CSRT process purportedly provided by the DTA is the requirement of consideration of the "probative value" of coerced statements. Section 1005(b)(1). Even that provision is inconsistent with the Convention Against Torture, which the State Department has expressly admitted applies to CSRT and ARB proceedings. In addition, the DTA prohibits reconsideration of any past determination of "enemy combatant" status derived from coerced statements. Section 1005(b)(2).[3] Consequently, the "improvement" purportedly provided by Section 1005 of the DTA is illusory. Where, as here, the established procedures are unconstitutional, judicial oversight through habeas corpus is even more critically important.[4]

---

[3] The due process inadequacies of the DTA are in stark contrast to the rules of procedure established in the Alien Terrorist Removal Court of the United States. there, suspected terrorists are afforded a myriad of procedural due process rights before they may be removed from the United States, including neutral judicial involvement, access through appointed counsel to classified evidence, discovery, proof by a preponderance of terrorist status, and significantly, appellate rights. 8 U.S.C. § 1531 *et seq.* Alleged terrorists facing removal are further entitled to consideration for release pending removal, and review of detention at least every six months.

[4] Of course, as the dissenting Justices made clear in their dissent in *Boumediene II*, the premise that there is some adequate remedy to exhaust in the D.C. Circuit Court of Appeals is flawed by that court's narrow view of Petitioner's rights:

The lower court expressly indicated that *no constitutional rights* (not merely the right to habeas) extend to the Guantanamo detainees, [*Boumediene I*], 476 F.3d at 991-92 (rejecting petitioners' arguments under this Court's precedent that fundamental rights afforded by the Constitution extend to Guantanamo, and noting that "[p]recedent in this circuit also forecloses the detainees' claims to constitutional rights"). Therefore,

## II.

### AT A MINIMUM, THIS COURT MUST STAY ANY RULING ON DISMISSAL AND HOLD THE ACTION IN ABEYANCE PENDING EXHAUSTION OF POTENTIAL DTA REMEDIES

Dismissal for lack of subject-matter jurisdiction is proper only when the federal claim is frivolous or foreclosed by prior decisions of the Supreme Court. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998). The Circuit Court's split decision in *Boumediene v. Bush*, and the split commentary from Supreme Court Justices on the denial of certiorari in that case, establish that the issues involved are substantial and that the Supreme Court has *not* decided the important questions that were deferred pending exhaustion of available remedies. 476 F.3d 981 (D.C. Cir.), *cert. denied*, 127 S. Ct. 1478 (2007).

The Supreme Court has provided a clear road map for the litigation involving detainees who filed habeas corpus petitions from Guantánamo at a time when this Court had initial jurisdiction under *Rasul v. Bush*, 542 U.S. 466 (2004). While available remedies are being exhausted, the District Court has authority to enter a stay-and-abey order to safeguard habeas rights during the period of exhaustion, and such an order is mandatory in the absence of frivolous claims and intentional delay. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). While the merits are stayed pending exhaustion and during post-exhaustion litigation, this Court has the authority to maintain the supervisory orders this Court has entered regarding access to counsel and protection of privileged information. *United States v. United Mine Workers of America*, 330 U.S. 258, 290-91 (1947); *In re President and Directors of Georgetown College*, 331 F.2d 1000, 1005 (D.C. Cir. 1964).

Permitting Petitioner to present his post-exhaustion facts and claims to this Court is logical,

---

it is irrelevant, to petitioners, that the DTA provides for review in the D.C. Circuit of any constitutional infirmities in the proceedings under that Act, § 1005(e)(2)(C)(ii), 119 Stat. 2742; the lower court has already rendered that provision a nullity.).

*Boumediene II*, 127 S. Ct. at 1480.

12

fair, and compelled by governing Supreme Court authority. Particularly in a case such as Petitioner's, where Respondents have not produced one single piece of evidence that might justify Petitioner's detention, and where there is not even any evidence that Petitioner has a final determination which can be reviewed by the Circuit Court under the terms of the DTA, this Court must stay any decision on dismissal in light of the fact that this Court may be the only forum in which Petitioner ultimately may be heard on the merits of his indefinite detention. The motion to dismiss should be denied.

**A.    This Court Retains Subject-Matter Jurisdiction Over The Habeas Corpus Petition As Long As The Petitioner's Claims Are Not Frivolous And Have Not Been Decided On The Merits By The Supreme Court.**

The government places primary reliance on *Steel Co.* for the unremarkable proposition that jurisdiction is a threshold question (Motion at 4). The government ignores the preceding language in *Steel Co.* that supports this Court's jurisdiction to maintain the habeas action as long as a legitimate controversy exists that has not been resolved on the merits by the Supreme Court. *Steel Co.*, 523 U.S. at 89.

The starting point of *Steel Co.* is that the District Court has subject matter jurisdiction as long as there is a non-frivolous argument that the laws and Constitution support the claim:

> [T]he district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.' . . . unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'

523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83, 685 (1946)). As demonstrated by the dissenting opinions at both the Circuit Court level and on the denial of certiorari in *Boumediene*, there is a reading of the Constitution and laws of the United States that would sustain Petitioner's habeas corpus petition. 476 F.3d at 994-1012 (Rogers, J., dissenting); 127 S.Ct. at 1479-81 (Breyer, Souter & Ginsburg, JJ., dissenting from denial of certiorari).

The *Steel Co.* opinion also establishes that a Circuit Court opinion, such as *Boumediene*, is

not sufficient to deprive the Court of subject-matter jurisdiction.  Only when the Supreme Court rules adversely on the merits is dismissal for want of subject matter jurisdiction appropriate: "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, *foreclosed by prior decisions of this Court*, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co.*, 523 U.S. at 89 (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974) (emphasis added)).  The *Boumediene* denial of certiorari is emphatically not a ruling on the merits. Moreover, the jurisdictional issues are obviously not frivolous considering the split of opinions in the Court of Appeals and Supreme Court.

Ironically, the government's own Motion recognizes this Court's continuing jurisdiction while the merits are exhausted, litigated, and appealed.  In footnote 15, the government points out that the Protective Order should survive dismissal, citing to a case upon which the petitioner relies—*United Mine Workers* (Motion at 8-9).  As argued *infra*, *United Mine Workers* establishes that the District Court has the authority throughout the litigation to maintain the status quo by enforcing the protective order and otherwise ensuring that "the office and purposes of the writ of habeas corpus are not compromised," as Justices Stevens and Kennedy put it in *Boumediene*.[5]

This Court retains the power to decide its own jurisdiction in the first instance.  *Kircher v. Putnam Funds Trust*, 126 S.Ct. 2145, 2155; *United States v. Ruiz*, 536 U.S. 622, 628 (2002).  While the efficacy of the DTA remedies are determined, it is premature for this Court to determine the dispositive questions.  Meanwhile, this Court should follow the stay-and-abey norm established in *Rhines*, then, if the case is not mooted by the DTA proceedings, provide the petitioner the opportunity to make his record, to present his claims, and to receive a decision based on the facts and law of his individual case.

---

[5]  The government's position regarding selective survival of the protective order's provisions is untenable.  If this Court were to dismiss, the protective order would continue in full effect until the protective order itself, or individual provisions, were dissolved by separate order of this Court.

The government's position is based on a fundamental misunderstanding of what it means for a court to have jurisdiction. "Jurisdiction is a word of many, too many, meanings." *Steel Co.*, 523 U.S. at 90 (quoting *United States v. Vanness*, 85 F.3d 661, 663 n. 2 (D.C. Cir. 1996)). While the *Boumediene* opinion states the current law of the Circuit, the ruling does nothing to impair Petitioner's rights to exhaust his remedies while this Court preserves the status quo.[6] If necessary, after exhaustion, this Court, the Circuit Court, and the Supreme Court have jurisdiction to determine the substantial issues raised by the petitioner without prejudgment based on a Circuit Court ruling that does not address Petitioner's specific factual and legal claims.

**B.    *Boumediene I* is Distinguishable.**

The government attempts to stretch the Circuit Court's *Boumediene* decision far beyond its reach. Despite the initial jurisdiction found in *Rasul*, a split panel of the Court of Appeals found that post-*Rasul* statutes deprived the courts of jurisdiction over petitions involving aliens detained at Guantánamo. *Boumediene I.*  Only because the petitioners in those cases had declined to seek review directly with the Circuit Court under the Detainee Treatment Act of 2005, the Court found that the "only recourse" was to vacate the District Court decision and dismiss the case for lack of jurisdiction. *Boumediene*, 476 F.3d at 994.  The petitioners filed for a writ of certiorari and, on April 2, 2007, the Supreme Court denied certiorari, with both a three-Justice dissent and a two-Justice statement respecting the denial of certiorari.  *Boumediene v. Bush*, 127 S.Ct. 1478 (2007) (*Boumediene II*).

---

[6] The government erroneously cites to *Ayuda v. Thornburg*, 919 F.2d 153 (D.C. Cir. 1990), for the proposition that a Court of Appeals opinion immediately becomes the law of the circuit, depriving the courts of the power to stay and hold in abeyance.  In fact, the majority ruled in *Ayuda* that a stay was appropriate.  The government cited a concurring opinion only, and, in that opinion, the concurring Judge ultimately agreed with the majority, which rejected the proposition that the court lacked power to enter a stay.  *See Ayuda*, 919 F.2d at 156 (Henderson, J., concurring).  The other concurring and dissenting opinion correctly articulated the applicable law that, until the Supreme Court speaks on jurisdiction, the District Court has the power to determine its own jurisdiction including "minimally, the power to maintain the status quo." *Ayuda*, 919 F.2d at 155-56 (Wald, C.J., concurring and dissenting).

The statement of Justices Stevens and Kennedy found that, given "our practice of requiring the exhaustion of available remedies as a precondition to accepting jurisdiction over applications for the writ of habeas corpus," denial of certiorari was appropriate "at this time." *Id.* The Justices specifically expressed concern regarding maintenance of the status quo during the litigation: "Were the government to take additional steps to prejudice the position of petitioners in seeking review in this Court, 'courts of competent jurisdiction,' including this Court, 'should act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised.'" *Id.* (quoting *Padilla v. Hanft*, 547 U.S. 1062 (Kennedy, J., concurring in the denial of certiorari)).

The government's reliance on *Boumediene* is misplaced.  First, the Circuit Court's reference to the *Boumediene* petitioners' decision not to exhaust, coupled with Justice Stevens and Kennedy's explicit adoption of the exhaustion model based on *Ex parte Hawk*, 321 U.S. 114 (1944), support continuing the stay while the DTA remedy is exhausted.  *Id.* Second, Justice Stevens and Kennedy's citation to Supreme Court authority regarding the efficacy of the alternative remedies contemplates an underlying habeas corpus case in which the petitioner can present such arguments to the District Court and, if necessary, the Circuit Court and Supreme Court.

    *1.*    *Justices Stevens and Kennedy Explicitly And The Circuit Court Implicitly Adopted The Exhaustion Of Remedies Model For Habeas Relief.*

*Boumediene* does not control this case because, unlike the petitioners in that case, Petitioner here is exhausting his remedies under the DTA.  The Circuit Court opinion expressly predicated its dismissal order on the petitioners' failure to utilize available remedies under the DTA. *Boumediene*, 476 F.3d at 994. Justices Stevens and Kennedy explained that "[d]espite the obvious importance of the issues," the Court was denying certiorari "at this time" in light of the Court's practice of requiring exhaustion of available remedies, citing *Ex parte Hawk.  Boumediene*, 127 S.Ct. at 1478.

The citation to *Hawk* is telling.  In that case, the petitioner filed for federal habeas corpus relief under circumstances, as in the present case, in which the effectiveness of other remedies had not been established.  The Supreme Court not only applied the exhaustion rule but held that the

adequacy of the available remedy should be decided in the first instance by "the federal district court":

> Where the state courts have considered and adjudicated the merits of his contentions, and this Court has either reviewed or declined to review the state court's decision, a federal court will not ordinarily reexamine upon writ of habeas corpus the questions thus adjudicated . . . . But where resort to state court remedies has failed to afford a full and fair adjudication of the federal contentions raised, either because the state affords no remedy . . . or because in the particular case the remedy afforded by state law proves in practice unavailable or seriously inadequate . . . , a federal court should entertain his petition for habeas corpus, else he would be remediless. In such a case he should proceed in the federal district court before resorting to this Court by petition for habeas corpus.

321 U.S. at 118 (citations omitted). The exhaustion model anticipates that the ultimate questions regarding jurisdiction, which may depend in large part on the efficacy of the DTA remedy, will first be considered and decided in the District Court. The ultimate issues would then be preserved for appellate and Supreme Court review, if necessary.

   2.     *The Jurisdictional Questions Regarding Habeas Corpus Cannot Be Resolved Until The Adequacy Of The DTA Remedy Becomes Known.*

Questions regarding the suspension and elimination of the writ of habeas corpus require consideration of whether alternative remedies provide protection coextensive with the Great Writ. *Swain v. Pressley*, 430 U.S. 372, 381 (1977) ("the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus."). The *Boumediene* statement on certiorari clearly sets out, with citation to *Marino v. Ragen*, 332 U.S. 561 (1947), that, if the DTA remedy is "inadequate", the Justices is prepared to address the merits of the habeas corpus claims. Further, the Justices stated that, in the interim, the government should take no additional steps "to prejudice the position of petitioners" in seeking review. *Id.*

The exhaustion model from the *Boumediene* litigation requires that the District Court proceeding remain in place for potential post-exhaustion litigation. This is particularly important in Petitioner's case. In the absence of a factual return or any other discovery in this case, there is

17

absolutely no indication that Petitioner has been subjected to a final CSRT determination within the meaning of the DTA. Absent such a final determination, the DTA review provisions would be inapplicable to Petitioner. There is no timeline within the DTA requiring the Respondents to make a final determination, and in the absence of such a determination, Petitioner would be precluded from any review or relief in the Circuit Court. *See* DTA § 1005(e)(2) (D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any *final* decision of a Combatant Status Review Tribunal" (emphasis added)). Although Respondents' Motion indicates that Petitioner was subjected to some form of CSRT process sometime between August 2004 and March 2005, s*ee* Motion Ex. A at 1, there is no indication that these proceedings were final within the meaning of the DTA, which was not passed until December 2005, some months *after* whatever CSRT process Respondents afforded Petitioner. Quite simply, Petitioner may have no remedy in the Court of Appeals by virtue of delay caused by Respondents. By maintaining the present case in the District Court, this Court is in a position to "act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised." *Boumediene II*, 127 S.Ct. at 1478. To dismiss now would be premature and allow Respondents the ability to further delay and prejudice the position of Petitioner in seeking adequate relief, thus triggering the conditions identified by Justices Stevens and Kennedy as warranting review. *Id.*

## C.    Because Petitioner Is Exhausting Available Remedies, The District Court Not Only Has Discretion To Enter A Stay-And-Abey Order, But Such An Order Is Mandatory Under *Rhines*.

Given the need to exhaust remedies under the DTA, the District Court proceedings should continue to be stayed and held in abeyance pending completion of the petitioner's DTA review. Petitioner has simultaneously filed a motion before this Court to stay the proceedings and have them held in abeyance. See *Petitioner's Notice of DTA Filing and Motion for Stay-and-Abey Order or, Alternatively, a Transfer Order Under 28 U.S.C. § 1631* (filed on May 3, 2007). Petitioner also opposes the motion to dismiss on the grounds set forth in his motion to stay, to which Petitioner respectfully refers the Court.

18

The government's attempt to distinguish *Rhines* fails because the government attempts to interpret *Rhines* to mean less than it actually says. The government contends that the power of the district court to stay-and-abey under *Rhines* is limited only to those instances when failing to stay-and-abey would cause a statute of limitations to run that would preclude the petitioner from refiling (Mot. at 6-7). This was the factual predicate in *Rhines*, not its holding. Nothing in *Rhines* limited the District Court's equitable power to stay-and-abey only to concerns regarding statutes of limitation. Rather, *Rhines* held that the equitable powers the District Court possessed before enactment of the statute of limitations continued to exist and were not extinguished by the statute. *Rhines*, 544 U.S. at 276. As in *Pace*, the concern warranting stay-and-abey was to protect the petitioner from impairment of future exercise of habeas corpus rights. *See Omar v. Harvey*, 479 F.3d 1 (D.C. Cir. 2007) (affirming the District Court's preliminary injunction barring transfer of a prisoner entered to preserve the court's jurisdiction over the habeas corpus petition of an American citizen detained in a military facility in Iraq). At any rate, the Respondents do not concede that Petitioner's rights would be unimpaired should he be forced to re-file after dismissal.

The same type of procedural obstacles that dismissal would create under 28 U.S.C. § 2254 confront detainees in Guantánamo who are cut off from contact with their lawyers and facing retroactivity questions regarding statutes that purport to impair the jurisdiction that unquestionably existed at the time the habeas corpus petition was filed. *Rhines* is controlling authority regarding stay-and-abey procedures while remedies are being exhausted.

**D.    Under *United Mine Workers*, The Court Has Authority To Preserve The Status Quo While Jurisdictional Questions Are Litigated.**

In the statement accompanying the *Boumediene* order, two Justices stated: "Were the government to take additional steps to prejudice the position of petitioners in seeking review in this Court, 'courts of competent jurisdiction,' including this Court, 'should act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised.'" 127 S.Ct. at 1478. The Justices' language demonstrates that the ultimate question of jurisdiction is for the Supreme

19

Court—at least for these unique cases, and that while the matter is under consideration, the courts have "authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition." *United Mine Workers*, 330 U.S. at 291 (quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906) (Holmes, J.)). The D.C. Circuit has not hesitated to apply these principles:

> Of course, whether or not there was jurisdiction to decide the merits, until the question of jurisdiction is determined, there was "authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition . . . ." Clearly there was "power to preserve existing conditions while . . . determining (the) authority to grant injunctive relief."

*In re President and Directors of Georgetown College*, 331 F.2d at 1005 (internal citations omitted) (quoting *Shipp* and *United Mine Workers*). This Court should carefully protect the status quo by maintaining the orders entered to date to assure the petitioner is not prejudiced in his ability to litigate the DTA action and to preserve potential remedies in this Court, on appeal, and on certiorari.

The denial of certiorari in *Boumediene* leaves unanswered predicate questions necessary to deciding issues in Petitioner's case including: Does the DTA provide a forum for resolving issues regarding unlawful detention coextensive with traditional habeas corpus? If not, has the writ been unconstitutionally suspended or eliminated? Is the government taking "additional steps to prejudice the position of petitioners in seeking review of this Court" and, if so, should this Court "act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised?"

The Respondent's motion to dismiss should be denied because this Court has insufficient information to answer a number of questions the DTA proceedings will answer. Further, if this Court eventually reaches the jurisdictional and constitutional questions, and rules adversely to the petitioner, there must be an adequate record for the Circuit Court's appellate review and, if necessary, for the Supreme Court to decide whether to grant a writ of certiorari, all of which requires that the petition in this Court remain in place until after the petitioner has exhausted the DTA procedures. During that process, the government should be foreclosed from prejudicing the

petitioner's ability to litigate these questions – at both the District Court and Circuit Court level.

**E.     The Protective And Other Procedural Orders Are Necessary To Assure That "The Office And Purpose Of The Writ Of Habeas Corpus Are Not Compromised."**

The dismissal of the District Court proceedings would constitute exactly the type of prejudice to the petitioner's ability to litigate that Justices Kennedy and Stevens instructed the courts to guard against. This Court properly addressed issues preliminary to ultimate disposition throughout this litigation. This Court's orders on access to counsel should remain intact pending exhaustion of DTA remedies.

The government suggests that the protective order they agreed to should be renegotiated and replaced in the Circuit Court (Motion at 9-11). This Court has been supervising the protective order for almost two years. If difficulties arose beyond the powers of the parties to resolve, the protective order included powerful mechanisms for the government to exhaust, up to and including contempt and criminal prosecution. The government's failure to exhaust their available remedies should foreclose action based on the government's complaints. The government's desire to substitute protective orders is no reason to dismiss this action instead of following the Supreme Court-approved stay-and-abey procedure.

Access between Petitioner and counsel is critical in this case. The complexities of the litigation need to be explained to a person suffering from the psychological distress of being indefinitely detained without charges for nearly six years. The protective order should remain intact, especially given that the Court of Appeals should have the option of continuing to administer the DTA litigation under the auspices of this Court's orders.

## CONCLUSION

For the foregoing reasons, the petitioner respectfully requests that the Court deny the government's motion to dismiss. Should the Court feel bound by the ruling of *Boumediene I*, Petitioner requests that the Court stay proceedings and hold any ruling on the merits in abeyance pending exhaustion of DTA remedies in the Court of Appeals. In the event the Court grants the motion, the petitioner requests that the Court stay the effect of the dismissal for an adequate time to permit appellate review.


Dated: May 3, 2007                              Respectfully submitted,


                                                /s/ Ellis M. Johnston, III
                                                /s/ Heather R. Rogers
                                                /s/ Reuben Camper Cahn
                                                Ellis M. Johnston, III (Cal. Bar No. 223664)
                                                Heather R. Rogers (Cal. Bar No. 229519)
                                                Reuben Camper Cahn (Florida Bar No. 874299)
                                                Federal Defenders of San Diego, Inc.
                                                225 Broadway, Suite 900
                                                San Diego, California 92101-5008
                                                Telephone: (619) 234-8467

                                                Counsel for Petitioner